UNITED STATES of America, Appellee

v.

Paul James McCARTHY, Appellant.

No. 13342.

United States Court of Appeals Third Circuit.

Argued Sept. 22, 1961. ·

Decided March 1, 1962.

Joseph E. Gallagher, Scranton, Pa., for appellant.

Daniel R. Minnick, Asst. U. S. Atty., Scranton, Pa. (Bernard J. Brown, U. S. Atty., Scranton, Pa., U. S. Atty., on the brief), for appellee.

Before GOODRICH, McLAUGHLIN and HASTIE, Circuit Judges.

McLAUGHLIN, Circuit Judge.

■ The defendant was convicted of bank robbery and appeals. On his behalf it is strongly argued that the evidence was not sufficient to justify the case going to the jury. While the jury under the evidence could have decided either way, we must agree with the district judge that a jury question was presented.

Appellant's other two points are substantial and call for a new trial. The first of these presents a Jencks Act situation. The defendant was interviewed by two F.B.I. agents and a Pennsylvania state trooper five days after the robbery. The agents, Smith and Carrig, took notes. Carrig prepared a report based on these. The report was discussed by both agents and Smith checked it for accuracy. The notes were routinely destroyed sometime prior to trial. Smith was a government witness. On cross-examination he was asked and replied as follows:

"Q. Did those notes correctly and accurately reflect what Mr. McCarthy told you?

"A. They were a summary of what he had told us.

*　*　*　*　*　*

"Q.. Did it [the report] correctly reflect the content of your notes?

"A. The report was only a summary of what Mr. McCarthy had told us, not a detailed summary of it."

Defense counsel moved that a copy of the report be made available to him for the purpose of cross-examining the witness. The motion was denied on the ground that "a summary * * * isn't covered by statute or Jencks or any of the cases."

The Jencks Act, 18 U.S.C. § 3500, provides that a statement in the possession

of the government, made by a government witness to a government agent, shall, on defendant's motion, be turned over to the defendant for the purpose of cross-examining the witness so long as the statement is relevant to the testimony of the witness. Subsection (e) of the Act defines "statement" as:

"(1) a written statement made by said witness and signed or otherwise adopted or approved by him; or

"(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement."

The government's position as stated in its brief is that since the report " * * * is not a verbatim interview with the defendant * * * [it] should not have been granted to the defense." This theory misconceives subsection (e) of the Jencks Act. The demand for the report is not governed by paragraph (2) of (e) but by paragraph (1). The same sort of problem was passed upon in Clancy v. United States, 365 U.S. 312, 81 S.Ct. 645, 5 L.Ed.2d 574 (1961). There an F.B.I. agent testified concerning an interview with one of the defendants at which he was present. He said he did not take notes at the time but afterwards returned to the office and made a memorandum of the interview. Another agent was present at interviews with three of the defendants. He compiled a memorandum from notes taken at the interviews by a third agent. Both of them signed the later memorandum of the conversations. The Supreme Court said at pp. 314–315, 81 S.Ct. at p. 647:

"The trial court, though directing delivery to the defense of notes made by the witnesses at the time of the interviews, refused the requests for the memoranda, saying that written statements were not covered by the Jencks Act unless they were made 'contemporaneously' with the interview. The Government now concedes that this was an erroneous ruling, as indeed it was. Each of these statements related 'to the subject matter as to which the witness has testified.' Each was a 'statement' as that word is defined in the Act. The requirement that it be contemporaneous applies only to 'a substantially verbatim recital of an oral statement' made to a government agent. By the terms of the Act, 'a written statement made by said witness and signed or otherwise adopted or approved by him' is also included. These statements fell in that category and should have been produced. Campbell v. United States, ante, 365 U.S. p. 85, 81 S.Ct. 421, 5 L.Ed.2d 428. And see United States v. Sheer [7 Cir.], 278 F.2d 65, 67–68. As the senate Report on the bill that became the Jencks Act states:

" 'The committee believes that legislation would clearly be unconstitutional if it sought to restrict due process. On the contrary, the proposed legislation, as reported, reaffirms the decision of the Supreme Court in its holding that a defendant on trial in a criminal prosecution is entitled to reports and statements in possession of the Government touching the events and activities as to which a Government witness has testified at the trial.

" 'The purpose of the proposed legislation is to establish a procedural device that will provide such a defendant with authenticated statements and reports of Government witnesses which relate directly upon his testimony.' "

In United States v. Berry, 277 F.2d 826 (7 Cir. May 2, 1960) the court said, p. 829, "In the instant case we have a Government agent as the witness whose written report to his superiors is sought to be produced for the purpose of his impeachment." And at p. 830, "We hold that where the nature of the statement sought otherwise meets the requirements of the Jencks statute, as in this case, such a written statement prepared by a Gov-

ernment agent may be used by the defendant in cross-examination of such witness for impeachment purposes." The question was again before the Seventh Circuit in United States v. Sheer, 278 F. 2d 65 (May 10, 1960). There the government based its objection to production of the reports on the fact that " * * * [they] were not made contemporaneously with the events therein referred to." The court said p. 68, " * * * we hold that the *time* of their making was not germane to their use as a basis for impeachment." And see United States v. Prince, 264 F.2d 850 (3 Cir. 1959).

■ Clearly, the report before us under the now settled law is substantially a written report by the witness Smith of the interview he and his fellow agent had with defendant which had been "signed or otherwise adopted and approved by him."

The government next makes its main argument as to the report saying that " * * * even if the Court should conclude that the lower Court erred in failing to permit defense counsel to view the report * * * such error was harmless error and not prejudicial to the defendant." Rosenberg v. United States, 360 U. S. 367, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959) is cited for this. Of the three withheld documents in Rosenberg (p. 369, 79 S.Ct. p. 1233) two "in no sense complied with subsection (e) of the statute;" the third was a copy of a statement by Rosenberg's confessed associate in crime. The original handwritten statement however was given petitioner's attorney. It was as to the third statement that the Court held the withholding of the copy to be harmless error.

In Clancy, which dealt with the kind of a problem now before us under subsection (e) (1), i. e., the testing of the credibility of an agent witness, not of the defendant, the Supreme Court said p. 316 of 365 U. S., p. 648 of 81 S.Ct.:

"We put to one side Rosenberg v. United States, 360 U.S. 367, 79 S.Ct. 1231, 3 L.Ed.2d 1304, where a failure to produce a document was considered to be harmless error under the

particular circumstances of that case. We do not reach the harmless error point because, if applicable, it is relevant only to the report of one of the agents, not to those of the other two. Since the production of at least some of the statements withheld was a right of the defense, it is not for us to speculate whether they could have been utilized effectively. As we said in Jencks v. United States, supra, 353 U.S. 657, 667, 77 S.Ct. 1007, 1 L.Ed.2d 1103:

" 'Flat contradiction between the witness' testimony and the version of the events given in his report is not the only test of inconsistency. The omission from the reports of facts related at the trial, or a contrast in emphasis upon the same facts, even a different order of treatment, are also relevant to the cross-examining process of testing the credibility of a witness' trial testimony.' "

As is seen there is at least grave doubt that Rosenberg is applicable in the present circumstances. However, there is no need of resolving that question now because in connection with at least three instances at the trial it affirmatively appears that the report could have been advantageously used. Defendant's first voluntary statement was made to the agents five days after the crime. The latter occurred 1:40 P.M. on March 26, 1959. Agent Smith was at the bank starting investigation of the crime at approximately 2:05 that afternoon. He continued with the investigation and a week later and from then on was the agent in charge of it. On March 31, 1959 he and Agent Carrig went to the defendant's home. The defendant voluntarily advised them fully regarding his activities on March 26th. These completely accounted for his whereabouts during the critical period. As has been narrated Smith said that he and Carrig took notes of what the defendant told them. Later Carrig used Smith's notes in preparing the report. Smith said, "There was a discussion between the two of us before he submitted the report, yes, and it would be a discus-

sion based upon our notes." He was asked and replied as follows:

"Q. Did you see the report he prepared?

"A. Yes.

"Q. Did it correctly reflect the content of your notes?

"A. The report was only a summary of what Mr. McCarthy had told us, not a detailed summary of it.

"Q. Well, the report did not reflect your interpretations or anything, did it?

"A. Only a summary of some of the things that he had told us."

Asked "Did those notes [which Smith made] correctly and accurately reflect what Mr. McCarthy told you?" Smith answered, "They were a summary of what he had told us." Asked, "Was it a correct and accurate summary of what he told you?" He answered "Yes, sir". Asked, "What did you do with your notes?" he answered, "My notes have been destroyed." Smith said that the report was not in his possession. He testified at length as to what he stated the defendant had told Carrig, the State Trooper, and himself on March 31, 1959. He outlined on a government map exhibit the route he claimed defendant had said he took from his home on the outskirts of Elmira, New York into that town and the route of his first return home. He said McCarthy told them he used that same course in going back to Elmira the second time and that after using laundromat facilities there he proceeded home. Smith also marked the path of that last trip on the map. Smith testified that defendant said to them that he had stopped for something to eat the first occasion he went to Elmira on the 26th. On cross-examination he denied that defendant had named different routes to him and his colleagues for the first three of the four trips. The defendant as a witness testified specifically as to the way he went to Elmira the first time and traced it on the map. That itinerary differed radically from Smith's version which the defendant categorically denied having given Smith.

Next, defendant told of his first return home and he marked on the map the roads he used. He was asked and answered:

"Q. Now did you tell Special Agent Smith that was the route that you took back to your home with the Chevrolet to pick up the laundry?

"A. I presume I did."

After doing some chores around his house, he said he picked up the laundry he was to take to an Elmira laundromat and went there the same way he had come. He was asked and replied:

"Q. Did you tell that to Special Agent Smith?

"A. Yes, sir."

He said that it was on this last journey that he stopped for something to eat prior to going to the laundromat. From what the defendant said, he finished at the laundromat, according to the court's calculation, about 1:10 P.M. It was after that, he testified, that he proceeded to his house by roads which were the same as Smith had said defendant had outlined to him fifteen months previously. The defendant fixed the time he arrived home as around two o'clock. Smith did not testify on his direct or cross-examination as to any mention by the defendant of the time of his first trip to Elmira on the 26th which the defendant thought was shortly after 11:30 A.M.; or when defendant ate in Elmira which defendant estimated as between 12:15 and 12:30 P.M.; or when he finished at the laundromat and left for home; or when he arrived home after the second time which he placed as around two o'clock.

What was involved in the above dull detail was an indispensable element of McCarthy's defense. Where he said he was and what he said he was doing between 10:30 A.M. and 2:00 P.M. on March 26, 1959, if believed by the jury, meant his acquittal of the dreadful crime with which he was charged. He had a lot going for him in the case. He was a young farmer with a wife and small children; a Korea veteran; never been in any kind of trouble. The prosecution proofs were vulnerable. He had voluntarily and fully

cooperated with the agents. He had even permitted himself to be dressed and masked as they said the robber had been. He had submitted to the closest of scrutiny by the bank personnel and none of them had identified him. Finally, he had taken the stand in his own defense, denied under oath any knowledge of the offense and told at length of what he said had been his entire activity during the critical period. If what he swore to in court over a year later had been told by him to the F.B.I. immediately after the robbery, it might weigh heavily in his favor. If important segments of it, denied by Smith, were in the report that might help. If they were not in the report though the specific steps of the last of the four trips were enumerated, the jury could have concluded McCarthy was telling the truth when he told of giving his exact route to the agents on all four. This could very well have strengthened the jury's confidence in the balance of defendant's testimony. The time when he said he had some food in Elmira might or might not have become significant. He placed it after he had finished in town and just prior to finally leaving for home. Smith said McCarthy told him it was immediately after first leaving home in the morning and as soon as he arrived in Elmira. If the report supported Smith's testimonial version, the jury might have mistrusted its accuracy with a converse favorable reaction towards McCarthy.

The other particular item had to do with Smith's story affecting the defendant's explanation that what cash he possessed came "from money he had around the house." Smith said that later, on December 14, 1959, the defendant claimed it came from the bank of one of his children to which there had been various contributions from his wife, the grandparents and other relatives. If the report had been produced and if it had substantiated McCarthy's testimony that he had told the agent in the beginning that the cash had come from savings he kept around the house, again the result could have been of real value to the defendant before the jury.

We do not pretend to have exhausted the useful potentialities of the report to the defense and as the Supreme Court said in Clancy et al. v. United States, 365 U.S. 312, 81 S.Ct. 645, 5 L.Ed.2d 574 (1961) " * * * it is not for us to speculate whether they could have been utilized effectively." In that opinion as already quoted the Court reiterated its dispositive statement in Jencks v. United States, 353 U.S. 657, 667, 77 S.Ct. 1007, 1013, 1 L.Ed.2d 1103 (1961), relative to the type of report before us, saying:

"Flat contradiction between the witness' testimony and the version of the events given in his report is not the only test of inconsistency. The omission from the reports of facts related at the trial, or a contrast in emphasis upon the same facts, even a different order of treatment, are also relevant to the cross-examining process of testing the credibility of a witness' trial testimony." [1]

What we are confronted with is a serious Jencks problem directly controlled by the Supreme Court's Clancy opinion, and incapable of being honestly labeled "harmless error". This defendant was entitled to have the full trial use of the report. The inclusion of the report in the appendix calls for no change whatsoever in the substance of this branch of the opinion. If anything, it strengthens the views expressed.

The final point suggests plain error in the charge to the jury which substantially affected defendant's right to a fair trial.

This emanates from the testimony of Nichols, a witness on behalf of the government. He said he drove in his car to East Smithfield, Pennsylvania, where the robbery occurred, the day it happened and shortly before; that a car was parked on a corner of an intersection where he made a left turn; a man sat in the car holding a paper up to his eyes. He was asked what "impressions" he had as to who it

---

[1]. In the light of the above, United States v. Annunziato, 293 F.2d 373 (2 Cir. 1961) is of no moment here.

was. He said, "Well, at that time I thought it was Paul McCarthy." The witness saw McCarthy perhaps a week or so after that, saying "Well, as I was going out of the office to go to the stairs I saw Paul McCarthy arriving and at that time he turned and went the other way down the stairs or into the rest room, I couldn't tell you which." The witness saw McCarthy again that fall stating "I went in to get compressor blades sharpened and Paul was there working on a wagon *and we exchanged greetings and talked a few minutes there,* and I went on to Knoxville, Pennsylvania." (Emphasis supplied). Cross-examination revealed that following the robbery Nichols came right up to the bank. He was called into the back office and talked with a law enforcement officer whose name might have been Strempek or Pecht. He was asked about seeing a car parked at the intersection but he did not say anything as to any impression of his that McCarthy was in it. Later that afternoon he was talking to the son-in-law of the president of the bank and said nothing to that person about McCarthy. After that two police officers talked to him about the robbery. He did not say anything to them about McCarthy.

The trial judge opened his charge with statements about the indictment and pertinent governing principles. Then he proceeded to the facts, starting with allusion to Nichols' evidence and saying:

"I am sure in your days you went back to Proverbs. If you go to Proverbs, Chapter 28, Verse 1, you will find: 'The wicked flee when no man pursueth: but the righteous are bold as a lion.' If you go to Leviticus, Chapter 26, Verse 17, you will find: ' * * * and ye shall flee when none pursueth you.'

"Now then, we permitted the testimony of one witness here, the man from the livestock yard, who said that on one occasion when the defendant *saw* him, he turned and went another direction. It does not mean because we are charging you on the law that that is what happened here at all. There may be a thousand other reasons for him turning and going in the other direction. But we say to you that that is one of the things that can be considered by a jury, and our reason for having it is that in certain situations a fleeing, or escape, or fear may be some indication to a jury of a man's mind." (Emphasis supplied.)

It is noted that Nichols when he saw McCarthy shortly after the robbery did not state that McCarthy saw him and McCarthy testified that he did not see Nichols then. It is also noted that when next Nichols saw McCarthy and the latter did see him they " * * * exchanged greetings and talked a few minutes * * *."

The judge was under a mistaken impression, which neither counsel ever corrected, as they should have, that Nichols had testified the defendant "saw" him. Conveying that thought to the jury was of major damage to the defendant. It could have destroyed whatever chance he had of trust by the jury in his evidence for he denied that he saw Nichols then. And immediately preceding the erroneous statement that McCarthy, seeing Nichols, "turned and went another direction" there had been the mentioned Biblical reference. The court's further language on the incident continued the unwarranted assumption that McCarthy had seen Nichols and after that "turning and going in the other direction."

■ This portion of the charge was plain error in its unintentional misstatement of an important fact and in its use of the illustrations. The same Proverbs quotation came under the scrutiny of the United States Supreme Court in Hickory v. United States, 160 U.S. 408, 422, 16 S. Ct. 327, 40 L.Ed. 474 (1896), where the use of that Biblical language by the trial judge in his charge was most strongly condemned. The judgment of conviction was reversed by reason thereof and for other charge errors. See also Quercia v. United States, 289 U.S. 466, 470–471, 53 S.Ct. 698, 77 L.Ed. 1321 (1933); Billeci v. United States, 87 U.S.App.D.C. 274,

184 F.2d 394, 402–403, 24 A.L.R.2d 881 (D.C.Cir. 1950).

Further objections to the charge should be mentioned briefly. It is sound law that where there is question of whether testimony amounted to identification of the defendant or of objects involved, the jury should be instructed how the evidence is to be considered and the degree of certainty it must reach to warrant a conclusion of identity. Commonwealth v. Ronello, 242 Pa. 381, 387, 89 A. 553 (1913). It is also axiomatic that where evidence of a witness or witnesses is outlined to a jury an impartial picture thereof must be given. Proper requests to charge and objections would have called the court's attention to these matters and afforded the court the opportunity it should have had, to consider them.

The judgment of the district court will be reversed and the case remanded for a new trial on the merits.