GOVERNMENT OF THE VIRGIN ISLANDS

v.

FITZGERALD LOVELL, Appellant

No. 17,275

United States Court of Appeals
Third Circuit

Argued January 27, 1969
Decided April 28, 1969

*See, also, 410 F.2d 307; 6 V.I. 422*

RUSSELL B. JOHNSON, ESQ., Christiansted, St. Croix, Virgin Islands, *for appellant*

ALMERIC L. CHRISTIAN, ESQ., United States Attorney, St. Thomas, Virgin Islands, *for appellee*

Before MARIS, FREEDMAN and VAN DUSEN, *Circuit Judges*

OPINION OF THE COURT

VAN DUSEN, *Circuit Judge*

This appeal is from an order of January 12, 1968, in which the District Court of the Virgin Islands denied defendant (appellant) a new trial after a hearing on the producibility of certain documents under the Jencks Act, 18 U.S.C. § 3500.

The Government of the Virgin Islands filed an information against defendant in 1966, charging him with murder in the first degree. At his trial, one of the Government's witnesses was Charles Groneveldt, the supervising detective in the case. On cross-examination, after eliciting from Groneveldt the fact that he had made reports during the investigation, defendant's counsel requested their production by the Government under the Jencks Act (N.T. 214-5). This request was denied by the trial judge (N.T. 217). A conviction and sentence of life imprisonment followed.

One of the contentions on appeal from the conviction was that it was error to deny the Jencks Act request. This court held (in our No. 15,817) that the Act applied to

prosecutions brought by the Government of the Virgin Islands and remanded the case for a hearing to determine whether the reports fell within the Act and, if they did, whether the error committed was harmless. Government of Virgin Islands v. Lovell, 6 V.I. 422, 378 F.2d 799, 805–806 (3rd Cir. 1967).

The hearing was held on November 7, 1968. At that time the entire investigative file was produced in court.[1] From it, the Government introduced six documents as possibly subject to the Jencks Act. The remainder of the file was sealed after the trial judge determined in camera that its contents did not fall within the Act (H.R. 22–24). In a memorandum opinion, the District Court held that only a portion of one of the exhibits was subject to production and that its unavailability at trial did not prejudice defendant.

Defendant complains particularly on this appeal of the lack of opportunity to inspect at the trial portions of two investigative reports.[2] Dated November 17 and 19, 1965, respectively, they contain brief résumés of interviews with various witnesses. One of these witnesses was Albert Skeete, with whom defendant had been boarding for several weeks prior to the alleged murder. The reports summarize separate interviews with Skeete in which he makes contradictory statements as to whether defendant

---

[1] We assume the reports were "in the possession of the United States" within the meaning of the Act, despite the fact that at the trial and again at the hearing on remand the United States Attorney stated that the only report he ever received from Groneveldt was an unsigned, undated list of witnesses, giving a one-sentence summary of their anticipated testimony (N.T. 217, H.R. 29–31). Cf. Augenblick v. United States, 377 F.2d 586, 597–598 (Ct. Claims 1967), reversed on other grounds, 37 L.W. 4081 (1-14-69); Beavers v. United States, 351 F.2d 507 (9th Cir. 1965); United States v. Knox Coal Company, 347 F.2d 33 (3rd Cir.) cert. den. sub nom. Lippi v. United States, 382 U.S. 904 (1968).

[2] These two reports (P-1 and P-3) were among the six introduced by the Government at the hearing on remand as possibly falling within the Act. Defendant does not contend in his brief that any of the other four were producible.

was home during the night of October 1–October 2, 1965.[3] Since the Government contended that the victim had died in the early morning hours of October 2, defendant argues there was reversible error in the denial to him of these statements for impeachment purposes.

■ The interviews with Skeete contained in the two investigative reports were not producible under the Act after the direct examination of Groneveldt, since the contradictory statements did not " . . . relate . . . to the subject matter as to which the witness has testified . . . ." as required by § 3500(b).[4] See United States v. Scolnick, 392 F.2d 320 (3rd Cir.), cert. den. sub nom. Brooks v. United States, 392 U.S. 931 (1968); United States v. Meisch, 370 F.2d 768 (3rd Cir. 1966). Groneveldt did not give any testimony relating to the whereabouts of defendant on the night of October 1, nor did he mention Skeete in any context (see N.T. 50–53, 201–221, 356–362, 405–408, 434–441, 455–456).[5]

---

[3] The interview reports contain this language

"(Mr. Albert Skeete) residing at Estate Whim, Fredericksted, was interviewed and stated that the subject 'Bajan' [defendant] resided with him for the past two weeks. . . . *Mr. Skeet further stated that on Saturday, October 2, 1965, 'Bajan' arose about 5:30 A.M. and left the house.* [Emphasis supplied.] He further states that on Sunday morning October 3, 1965, 'Bajan' washed all his work clothes."
(Report dated 11–17–65)

"Reinterview of Mr. Skeet

Mr. Albert Skeet was interviewed this date . . . *Mr. Skeet further stated that on Friday, October 1, 1965, the subject did not come home or sleep in the house.* [Emphasis supplied.] Mr. Skeet stated he next saw Fitzgerald Lovell Saturday morning, about 8:00 or 9:00 P.M. [sic] and that on Sunday morning about 10:00 A.M. the subject, Fitzgerald Lovell washed his clothing."
(Report dated 11-19-65)

[4] "After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified . . . ." 18 U.S.C. § 3500(b).

[5] Although a statement which would support impeachment for faulty memory would apparently be sufficient as "relating" to a witness' testimony, see Rosenberg v. United States, 360 U.S. 367 (1959), it was not Groneveldt's, but Skeete's memory which was cast into doubt by the reports. And though the interviews did relate to the subject matter of Skeete's testimony which was introduced by the Government later in the trial (N.T. 178–196),

■■■ In addition, the November 19 report was not a "statement" within the meaning of § 3500(e).[6] Signed by Torres, a detective, it bore a signed notation by Groneveldt that the report was "approved". Groneveldt testified at the hearing on remand that he approved this report only as having been made on schedule, not as a statement by him of what the facts were (H.R. 20). Thus its description of the interview with Skeete was not "made by [Groneveldt]. . . and signed or otherwise adopted or approved by him" under § 3500(e)(1).[7] We agree with the First Circuit that that subsection contemplates ". . . an approval comparable to a signature, and refers to the written statement itself, not merely approval of a general account of which the writing may be representative." Campbell v. United States, 296 F.2d 527, 533 (1961), on remand 199 F.Supp. 905 (D.

---

a Jencks Act request for their production at that point would also be inappropriate, since Skeete did not sign the reports and there is no evidence he otherwise adopted or approved them under § 3500(a)(1), nor were they within § 3500(e)(2). See footnote 7. Indeed, Skeete could not remember at the preliminary hearing on December 7, 1965, having talked to the police about defendant and he testified he had never given them any written statement (P.H. 28).

6 "The term 'statement', as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—

(1) a written statement made by said witness and signed or otherwise adopted or approved by him; or

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement." 18 U.S.C. § 3500(e).

7 The trial judge was not explicit as to why the November 17 report failed to come within the Act, nor can we determine from the record whether it qualified as a "statement" under § 3500(e)(1). Like the report of November 19, it bears Torres' signature and Groneveldt's signed approval. But Groneveldt testified at the hearing on remand that it contained facts determined both by him personally and by others (H.R. 17), and since the report does not indicate who questioned Skeete, we are unable to say that the interview was not "signed or otherwise adopted or approved" by Groneveldt. It does appear, however, that neither of the reports fell within § 3500(e)(2): they are not "recordings" within the meaning of that section, they are summaries and not a "substantially verbatim recital" of Skeete's statements, and, in the case of the November 17 report, there is no indication it was "recorded contemporaneously" with the interview (cf. H.R. 18). See Palermo v. United States, 360 U.S. 343 (1959); United States v. Allegrucci, 299 F.2d 811 (3rd Cir. 1962); United States v. Grunewald, 162 F.Supp. 621 (S.D.N.Y. 1958).

Mass.), aff'd. 303 F.2d 747 (1962), vacated on other grounds and remanded, 373 U.S. 487 (1963). Cf. United States v. McCarthy, 301 F.2d 796 (3rd Cir. 1962). Also, the District Court's determination that the November 19 report was approved by Groneveldt only in his administrative capacity, and thus not within the meaning of § 3500(e)(1), is subject to "appropriately limited review of appellate courts," Palermo v. United States, 360 U.S. 343, 353 (1959), which review apparently is confined to examination for an abuse of discretion, see United States v. Augenblick, 37 L.W. 4081 (1/14/69).[8]

■■ Assuming the reports were producible under the Act, defendant suffered no prejudice by not having seen them. The Supreme Court has recognized that the lack of opportunity by the defense to inspect documents covered by the Jencks Act may be harmless error. Rosenberg v. United States, 360 U.S. 367 (1959). See, also, e.g., United States v. Knox Coal Company, supra, footnote 1; United States v. McCarthy, supra; United States v. Allegrucci, supra, footnote 7. At the preliminary hearing on December 7, 1965, Skeete testified that defendant had left the house in the late afternoon of October 1, 1965, and did not return until the following day (P.H. 12–13, 15). Defendant's counsel then introduced into evidence a paper, signed by Skeete on December 1, 1965, in which he had represented to counsel's law clerk that defendant had been home the night of October 1.[9] On cross-examination (P.H. 20–29), Skeete

---

[8] There is a conflict in the Circuits as to whether the "clearly erroneous" rule discussed in Campbell v. United States, 373 U.S. 487 (1963), applies to a District Court's determination that a report is not a "statement" under § 3500(e). Compare Canaday v. United States, 354 F.2d 849 (8th Cir. 1966), and United States v. Gosser, 339 F.2d 102 (6th Cir. 1964), cert. den. 382 U.S. 819, rehearing denied, 382 U.S. 922, rehearing denied, 382 U.S. 933 (1965), with Williams v. United States, 338 F.2d 286 (D.C. Cir. 1964).

[9] The statement was as follows:
"Mr. Lovell was with me Mr. Skeete, on Friday October 1st. Lovell spent the night with me. On Saturday morning, October 2nd, 1965, I gave Lovell the key to my house as I went to town. I then saw Lovell at about

acknowledged his handwriting and signature, and the correctness of the paper's contents (P.H. 22–24), but defendant's counsel did not utilize this opportunity to question him specifically on the conflict in the statements. At trial, the complete transcript of Skeete's testimony at the preliminary hearing (P.H. 10–29) and the statement given to the law clerk were read into the record (N.T. 178–196, 203–204), as Skeete was ill and unable to be present. In his closing statement, defendant's counsel forcefully argued the inconsistency to the jury.[10] Bearing in mind the Supreme Court's caution in Rosenberg that appellate courts should not easily presume to decide whether the defense would find a producible statement useful, we can nevertheless conclude here, as it did there, that "[s]ince the same information that would have been afforded had the document been given to defendant was already in the possession of the defense by way of the witness' admissions while testifying, it would deny reason to entertain the belief that defendant could have been prejudiced by not having had opportunity to inspect the [report] . . . . There is such a thing as harmless error and this clearly was such." Rosenberg v. United States, supra, at 371.

▆ In view of the fact that the same inconsistency revealed in Skeete's interviews with the police was already known to defendant's counsel by virtue of Skeete's testi-

___

3:00 p.m. on Saturday, October 2nd, 1965. Lovell bought some groceries and we ate together. Lovell went out in the evening.

[signed] E. J. Ocean—12/1/65

"This was read to me on the 1st of December 1965 this is exactly what I told Mr. Ocean.

[signed] William Albert Skeete."

10 N.T. 528–531. After quoting Skeete's testimony at the preliminary hearing to the effect that defendant was absent on the night of October 1, 1965, and then reading the statement taken by Ocean in its entirety, counsel stated:

"But I say to you that the testimony of Mr. Skeete adduced here by the Government to demonstrate that this man was gone from home all night the critical night is of vital interest and of vital concern and whether it's

mony at the preliminary hearing and of his signed statement given to such counsel's own law clerk, we are unable to say that the failure of the Government to make available to defendant or his counsel the reports in the possession of the police violated due process under Brady v. Maryland, 373 U.S. 83, 87 (1963), or any Sixth Amendment right, cf. United States v. Augenblick, supra.[11] No contention was made at the hearing on remand that there had been a denial of due process under the Brady principle at the trial of this case. The Supreme Court of the United States pointed out, in a recent decision discussing a situation where material producible under 18 U.S.C. § 3500 was lost,

"The record is devoid of credible evidence that they [certain notes and tapes] were suppressed. . . .

\* \* \*

"[A]part from trials conducted in violation of express constitutional mandates, a constitutionally unfair trial takes place where the barriers and safeguards are so relaxed or forgotten . . . that the proceeding is more a spectacle . . . or trial by ordeal . . . than a disciplined contest." United States v. Augenblick, supra, 37 L.W. at 4084.

This record does not justify the conclusion that the trial was "constitutionally unfair" within the meaning of the above-quoted language.

The January 12, 1968, order of the District Court will be affirmed.

---

true or not is up to you to decide. The fact that he made contradictory statements under oath on both times may indicate that he just doesn't know. He may indicate that one version is true and the other is false and that is the problem that you're going to have to resolve." (N.T. 531).

[11] As pointed out in footnote 1 above, the record makes abundantly clear that the only report which the prosecuting attorney had at the time of trial was "a statement listing witnesses" (P-6), which contains nothing whatever relating to Mr. Skeete's contradictory statements. In Brady v. Maryland, supra, relied on in the dissenting opinion, the prosecuting attorney had possession of and knowledge of the statement in question.

FREEDMAN, *Circuit Judge*, dissenting

As I see it the question is whether in the circumstances of this case the failure of the Government, even in good faith, to disclose to the defendant standing trial on a charge of murder the two contradictory statements given by Albert Skeet to the police on November 17 and 19, 1965, amounted to a denial of due process under the doctrine of Brady v. Maryland, 373 U.S. 83 (1963).

We need not, therefore, make our decision within the limited contours of the Jencks Act (18 U.S.C. § 3500) or choose between the competing elements of rigidity and flexibility in its construction. Cf. Palermo v. United States, 360 U.S. 343, 351–53 (1959). Indeed on the earlier appeal in this case in Government of Virgin Islands v. Lovell, 378 F.2d 799, 805 (3 Cir. 1967), we exercised our supervisory appellate authority to make the Jencks Act applicable in the Territory of the Virgin Islands as a "gloss" on the rule of Jencks v. United States, 353 U.S. 657 (1957).

I therefore put aside as peripheral the question whether the Jencks Act itself would apply in the circumstances of this case. Instead, the question for me is whether there was a violation of the guarantee of a fair trial, which is the objective of the exercise of our supervisory power over criminal proceedings.

A key figure on the issue whether the defendant had been at home during the night and early morning hours immediately preceding the murder was a 90 year old man, Albert Skeet, the defendant's landlord. When the case was called for trial Mr. Skeet was present in the courtroom and the Government intended to call him as a witness. He was suddenly taken ill and fainted in the courtroom and was removed to a hospital, where he remained until after the end of the trial. As a result of Mr. Skeet's illness the Government read to the jury his testimony at the preliminary hearing.

This procedure, which deprived the jury of the opportunity to observe Mr. Skeet and to weigh his credibility from his appearance and demeanor, was imposed on the defendant because of the Government's necessity. See Government of Virgin Islands v. Aquino, 6 V.I. 395, 378 F.2d 540. In these circumstances it seems to me that the burden was on the Government to inform the defendant of its possession of the two contradictory statements Mr. Skeet had given to the police, in one of which he said that the defendant was at home during the night and early morning of the murder and in the other said the opposite. This is particularly important because Mr. Skeet had said in his testimony at the preliminary hearing that he could not remember having talked to the police about the defendant.

The majority believes that the failure of the prosecution to disclose this information was not prejudicial to the defendant because Mr. Skeet had already been contradicted at the preliminary hearing. There he had testified on direct examination that defendant had not been at home on the night of the murder. On cross-examination, however, he acknowledged giving a statement to the law clerk of defendant's counsel that defendant had been at home in bed that night. It is therefore true that a contradiction had already appeared at the preliminary hearing between Mr. Skeet's direct testimony and his admission on cross-examination.

But there is a profound difference in the effect on the fact finder engaged in determining credibility between a single contradiction and a double one. This is especially true in the present case where the Government's witness was an aged, undernourished man[1] and the contradiction of his sworn testimony on behalf of the Government was pre-

---

[1] The physician who examined Mr. Skeet after he had been taken ill testified that he was badly nourished, emaciated and dehydrated.

sented in the form of a statement given to the law clerk of defendant's counsel. It would be relatively easy for a jury to discount such a statement obtained from a sick old man by the partisan advocate of the defendant. But the undisclosed statements, mutually contradictory and made only two days apart, were given to the police. They have in them none of the elements of importunity or the pressure of advocacy on behalf of the defendant. They were presumably the voluntary statements of a citizen given to police officers who had no apparent interest or bias but were attempting to ascertain the truth. I believe it unrealistic to hold that the presentation to the jury of these two mutually contradictory statements to the police was not a matter of paramount importance to the defense in undermining Mr. Skeet's testimony on direct examination at the preliminary hearing. They stand on a higher level and therefore would have been much more effective than the statement secured by the law clerk.

I think we must view the problem in all the surrounding circumstances. This is not a case where Mr. Skeet testified before the jury. The defense had no opportunity to cross-examine him in the light of what it may have learned from the testimony of the police officers. The defense did not have the advantage of the jury's observation of Mr. Skeet's testimony or the manner in which he reacted when he was confronted with his contradictory statement to the law clerk. The new and more serious contradiction embodied in the two statements to the police take on in these circumstances a significance which they might not otherwise have had. When the Government claimed the benefit of the rule of necessity which permitted it to have the advantage of Mr. Skeet's testimony without producing him on the stand it carried, it seems to me, a corelative burden of disclosing to the defendant the two contradictory statements to the

police which were of such profound importance in deciding the credibility of Mr. Skeet's testimony.

I therefore dissent.