UNITED STATES of America

v.

Nicholas CARAMANDI.

Crim. No. 74–735.

United States District Court,
E. D. Pennsylvania.

Feb. 5, 1976.

Gary Tilles, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Robert F. Simone, Philadelphia, Pa., for defendant.

## MEMORANDUM OPINION

McGLYNN, District Judge.

Nicholas Caramandi was convicted by a jury of Conspiracy and Possession of Counterfeit Currency.[1] The Government's case rested upon the testimony of several Secret Service Agents and Frederick Angelucci, an indicted co-conspirator who had entered a plea of guilty. Caramandi moved for a new trial and for arrest of judgment. These motions were denied for the reasons which follow.

### Motion In Arrest of Judgment

Defendant's Motion In Arrest of Judgment asserts (a) that there was not sufficient evidence to sustain a conviction, (b) the verdict was against the weight of the evidence, and (c) the verdict was contrary to law.

■ Rule 34 of the Federal Rules of Criminal Procedure provides only two grounds for arrest of judgment: (a) the indictment or information does not charge an offense and (b) the Court is without jurisdiction of the offense charged. Since neither contention is made here, the motion was denied.

However, Caramandi moved for Judgment of Acquittal at the close of the evidence, which motion was denied, and there-

fore I have treated the Motion In Arrest of Judgment as also being a renewed Motion for Judgment of Acquittal under Rule 29(c). Since I was satisfied that there was evidence sufficient to sustain the conviction, the motion under Rule 29(c) was also denied.

### Motion for a New Trial

The defendant asserted three grounds for his Motion for a New Trial:

(a) The verdict was against the weight of the evidence,

(b) The Government knowingly permitted the use of false testimony by its "key" witness, and

(c) The Court erred in giving a one-sided charge to the jury.

### A—The Weight of the Evidence

■ When a movant alleges that the verdict against him is against the weight of the evidence, the Court must act as a "thirteenth juror", assessing the credibility of the witnesses and weighing the evidence objectively. If the Court reaches the conclusion that the verdict is contrary to the weight of the evidence and that a miscarriage of justice may have resulted, the verdict may be set aside. *United States v. Morris*, 308 F.Supp. 1348 (E.D.Pa.1970). The power to grant a new trial on this ground "should be granted only in exceptional cases in which the evidence preponderates heavily against the verdict." *United States v. Kermidas*, 332 F.Supp. 1312 (M.D.Pa.1971).

■ The testimony of the Government's witnesses, if believed, was more than ample to prove all the essential elements of the crimes charged. Therefore, the issue is refined to a question of credibility, a matter which is peculiarly within the province of the jury. The testimony of the co-defendant, Angelucci, was not only inherently credible, but the corroboration by Agents of the Secret Service was sufficient to overcome any reluctance one might have in accepting the testimony of an accomplice.

1. 18 U.S.C. §§ 371, 472 (1970).

In sum, the evidence disclosed an elaborate scheme to distribute and sell counterfeit currency. In the words of the witness Angelucci, the defendant Caramandi was to supply the notes, another co-defendant, Robert Cicalese, was to be the contact man with Caramandi, and Angelucci and still another co-defendant, Gerald Polidoro, were to be the salesmen.[1] The notes were to be purchased from Caramandi at 10% of their face value[2] and Cicalese, Angelucci and Polidoro were to share the profits from the sale equally.[3]

On June 29, 1974, Caramandi and a fourth co-defendant, John Terlingo, were observed by Secret Service Agents arranging brown paper bags in the trunk of Caramandi's automobile. They were later observed driving in the area of 7th and Dickinson Streets where Terlingo placed a brown paper bag containing 533 counterfeit federal reserve notes behind the wheel of a car parked on Beulah Street near Dickinson. Caramandi and Terlingo were then arrested by the Agents of the Secret Service. An examination of Caramandi's vehicle disclosed that the trunk had a trap door device which, when activated by the driver was capable of dropping packages from the trunk.

It was further established by Angelucci's testimony that in late May or early June, he and Polidoro had met Cicalese in a night club where Cicalese asked them if they would be interested in selling counterfeit.[4] They agreed, and on June 28, pursuant to a call from Cicalese, Polidoro and Angelucci drove with Cicalese to the St. Francis Room of the Drake Hotel. Cicalese said he had to meet Caramandi, from whom he was trying to get some samples.[5]

Angelucci, after waiting in the car, entered the hotel to use the men's room. He saw Cicalese and Caramandi standing together in the hallway outside the St. Fran-

cis Room. When Cicalese returned to the car, he showed Angelucci and Polidoro four or five sample ten dollar bills.[6] After viewing the samples, Cicalese and Angelucci agreed to order $15,000. face value in counterfeit money and Cicalese returned to the Hotel and placed the order. This consignment was picked up the following day by Cicalese and it was received in a brown paper bag. Upon examination, it appeared that some of these bills were "bad" in that the ink was smeared or the faces were blank. Because of the bad bills, it was agreed that they would pay $1,200. instead of $1,500. and Angelucci testified that he saw Cicalese hand $750. to Caramandi who put it in his pocket. At this meeting which took place on July 3, 1974, Angelucci asked Caramandi if there was more money available and he said yes, but "the heat was on". It is to be noted that Caramandi had been arrested four days earlier on June 29, 1974 and was participating in an ongoing conspiracy because as Caramandi said, "I need the money as much as anybody else to pay the lawyers".[7]

Three or four days later, another meeting took place at a bar at 7th and Kater Streets and Caramandi was asked when the next package was going to come through. Caramandi was not able to give them anything specific, but told them to be at that bar every day at approximately 11:00 in the morning. On July 8th, Cicalese received a telephone call at the bar and Cicalese stated that it was Caramandi. They drove to 6th and Tasker where Angelucci got out of the car and Caramandi got into it. Five or ten minutes later, three blocks away, Cicalese pulled up in the automobile, but Caramandi was not with him. When Angelucci got into the car, there was, lying on the floor, a brown paper bag containing counterfeit bills which totaled approximately $22,000. face value. Fifteen thousand dollars of this batch was sold to a Secret Service under-

1. N.T. 318.

2. N.T. 321.

3. N.T. 318.

4. N.T. 318–319.

5. N.T. 319–321.

6. N.T. 323.

7. N.T. 350.

cover agent the following day, at which time Angelucci was arrested. From that point on, Angelucci agreed to cooperate and to act as a Government informant in the further transactions.

Angelucci then testified concerning a transaction which took place on the morning of July 12, 1974 when Cicalese told him that he received a call from Caramandi telling him to go to the vicinity of 6th and Tasker Streets. Angelucci and Cicalese drove to 6th and Tasker in Angelucci's car. Angelucci left the vehicle and Cicalese drove off. Shortly thereafter, Cicalese returned and said he didn't get the money because "Nicky got jumpy" and called it off because he thought he saw some Secret Service Agents in the vicinity. Cicalese left again while Angelucci was calling the agents to apprise them of the washout, but he returned a short time later carrying a brown grocery bag under his arm. Angelucci testified that Cicalese told him that at Caramandi's direction, he went to 17th and Moore and that Caramandi met him and directed him to go up a side street where he would and did receive the package from another person.[8] This testimony is corroborated by a Secret Service Agent who testified that on the morning of July 12, 1974, while on surveillance at 6th and Tasker Streets, he observed Caramandi enter Angelucci's late model gold cadillac which was being driven by Cicalese.[9]

One further transaction took place on July 22, 1974, which resulted in the arrest of Robert Cicalese who thereafter agreed to cooperate with the Government.

On July 23, Caramandi appeared at Cicalese's apartment at which time Cicalese handed Carmandi the money supplied by the Secret Service in payment for the counterfeit notes delivered on July 22, 1974. At this meeting, Angelucci asked Caramandi if there would be any more packages and Caramandi replied that there would be one more.

As a result of this series of transactions, the Secret Service recovered counterfeit notes having a face value of approximately $85,000.

I have no difficulty in concluding that this evidence was more than adequate to establish that Caramandi was a participant in a criminal conspiracy to distribute counterfeit currency and that he had possession of counterfeit currency as charged in the indictment.

*B—The Allegation of False Testimony*

Caramandi next alleged that subsequent to trial, he discovered evidence that the Government let testimony by Angelucci stand uncorrected, though knowing it to be false, to the effect that he had only become an informant for the Government after his arrest on July 9, 1974 when, in fact, he had been an informant for several months prior to his arrest.

The source of this newly discovered evidence is Gerald Polidoro, one of the co-conspirators, who entered a plea of guilty before Caramandi's trial.

In reply to questions asked by a Private Investigator for Caramandi after he began serving his sentence at Allenwood Prison Camp, Polidoro stated the following:

Q. How long did you know Mr. Angelucci to be an informer, confidential informer?

A. I said, "three or four months before the arrest."

Q. During the arrest and after this case, you found out through reading notes of testimony and Angelucci's own admission?

A. Yes, he told me.

Q. That's how you knew he was an informer?

A. He told me he had ties with the Federal Government prior to this.

Q. Then by his own admission you knew of him to be an informer prior to this case, during this case—

A. And even after.

Q. —and even after the case?

8. N.T. 381–382.

9. N.T. 490–491.

A. And even after the case.

(transcript of statement of Gerald A. Polidoro taken the 22nd day of August, 1975).

Caramandi contrasts this statement of Polidoro with Angelucci's testimony at trial that as a result of the conversation which he had and the information which he received from the Secret Service Agents on the day of his arrest, he "agreed to help them, and continue the investigation." [10] Again, on cross examination, Angelucci testified:

Q. So you knew at that point unless you gave them your cooperation you might not even hit the streets since you were a parole violator, right?

A. That's correct.

Q. So you wanted to hit the streets, so you at that point agreed to inform on your friends and cooperate with the Government, correct?

A. That's correct.

Q. And then you called your partner up, Gerry,[11] on the phone and you lied to him, didn't you?

A. Yes.[12]

■ There can be no doubt that Angelucci testified he began his cooperation on the date of his arrest, but a fair reading of the transcript makes it patent that he was testifying only with regard to the matter under inquiry, that is, the facts of this case. He was not asked whether he was an informant on other occasions or whether he cooperated with the government on other cases. On the other hand, the statement attributed to Angelucci by Polidoro has much wider implications and could encompass any number of Angelucci's prior contacts with the law. This is self evident for in the the statement itself, Polidoro was asked by the Investigator, "Before this conspiracy even started, how long did you know of the connection, Mr. Angelucci's connection, [with the federal government]?" To which Polidoro replied, "At least three or four months before." (Polidoro's state-ment of 8/22/75, page 10). Obviously, therefore, whatever connection, if any, Angelucci had with the federal government three or four months before the conspiracy even began must have been in connection with an unrelated matter. I would conclude, therefore, the statement attributed to Angelucci by Polidoro is not inconsistent with Angelucci's trial testimony.

Secondly, it must be remembered that the source of this "newly discovered evidence" was a co-defendant who also was a victim of Angelucci's cooperation with the government and who at the time he gave the statement was serving a sentence of imprisonment. It is not unexpected that a person in such circumstances would join an attack on the credibility of the person responsible for his predicament. But it is noteworthy that he does not challenge his own conviction and thereby acknowledges the existence of the conspiracy and his own participation. Such an acknowledgement of itself lends credence to the substance of Angelucci's testimony.

■ Two other aspects of the Polidoro statement raise some questions concerning its credibility. As noted above, Polidoro stated that he knew even before the conspiracy began that Angelucci had connections with the federal government. If that is the case, then it strains credulity to suggest that he would have joined Angelucci in this criminal enterprise. In addition, almost four months elapsed from the time that Polidoro entered a plea of guilty until the time he gave the statement in question and almost three months after he had been sentenced. Having plead guilty before the beginning of Caramandi's trial, Polidoro was in a position to testify on behalf of Caramandi without prejudicing his own case. Now, having been sentenced, Polidoro no longer has any concern as to his own fate and may wish to serve the interest of his co-defendant, Caramandi.

But perhaps the most telling blow to the reliability of the Polidoro statement is that

10. N.T. 363.

11. (Gerald Polidoro).

12. N.T. 440.

he failed to use the information to his own advantage. If it were true as he stated that Angelucci told him three or four months prior to his arrest that he had been cooperating with the federal government and "whatever we done we can get away with",[13] such evidence might well negate the requisite criminal intent or, at the very least, establish a colorable entrapment defense.

Besides these inherent deficiencies which cast serious doubt upon the credibility of the Polidoro post-trial statement, it is also directly refuted by the testimony of the Secret Service Agent who first made contact with Angelucci. He testified he first met Angelucci on July 2, 1974 while working in an undercover capacity and that Angelucci agreed to become an informant for the government on July 9, 1974, the date of his arrest.[14]

■ One self-serving statement by a convicted co-defendant containing hearsay allegations which are totally unsupported by independent evidence and which conflict not only with Angelucci's testimony but with the government's agents as well does not necessitate an evidentiary hearing. *United States v. Curry,* 497 F.2d 99 (5th Cir.1974) *cert. denied,* 419 U.S. 1035, 95 S.Ct. 519, 42 L.Ed.2d 311 (1975); *See also, United States v. Brewer,* 360 F.2d 112 (3d Cir.1966).

■ In the final analysis, however, it is immaterial whether Angelucci began cooperating with the government three months before his arrest or on the date of his arrest. The relevant inquiry is what benefits Angelucci received from the government in exchange for his cooperation. That aspect was fully explored on both direct and cross-examination.

The facts here are unlike those found in *Napue v. United States,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) and *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). In those cases, the false testimony concerned whether any benefits or promises had been conferred upon the witness in exchange for his testimony. Here, Angelucci's only benefit was that the government would disclose to the court the extent of Angelucci's cooperation and would make no recommendation to the court concerning his sentence.[15] The defendant does not point out nor can we perceive any significance to the fact that Angelucci had been an informer for the government prior to his arrest. Even in its best light, the testimony of Polidoro could be used only to impeach Angelucci on a completely immaterial matter, and falls far short of substantiating a charge that the government permitted false testimony to stand uncorrected. *Compare United States v. McCrane,* 527 F.2d 906 (3d Cir.1975) *vacated,* —— U.S. ——, 96 S.Ct. 3197, 49 L.Ed.2d ——, 44 U.S.L.W. 3755 (U.S. June 29, 1976).

### C—The Charge

Caramandi also alleges that "the Court committed a grave error in its charge to the jury in that it failed to act impartially in summarizing the evidence." It is contended that the court "failed to sufficiently comment on the circumstances favorable to the defendant", and "never commented on any of the evidence illicited [sic] in cross-examination by the defense."[16]

■ Federal judges may comment upon and summarize the evidence in a case, *Starr v. United States,* 153 U.S. 614, 14 S.Ct. 919,

---

**13.** Transcript of statement of Gerald Polidoro of August 22, 1975 at 10.

**14.** N.T. 225–243.

**15.** N.T. 313.

**16.** Defendant, through his counsel, argues that the court violated Federal Rule of Evidence 105 which mandates a "fair and impartial summary" of the evidence. As will be developed, the court's duty to fairly and impartially summa-

rize the evidence derives from fundamental tenets of Anglo-American jurisprudence as reflected in the cases (*See, Quercia v. United States,* 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321, 1933), and not from the proposed Federal Rule of Evidence 105 which was deleted from the rules by the House and is not a part of the Rules as enacted by Congress. See S.Rep. No. 93–1277 Oct. 11, 1974.

38 L.Ed. 841 (1894), particularly in cases where the court believes it will aid the jurors in discharging their duties. *Gordon v. United States,* 438 F.2d 858 (5th Cir. 1971). The outline or summary must be impartially given. *United States v. McCarthy,* 301 F.2d 796 (3d Cir.1962). The court should remind the jury that they are the sole judges of the facts, and that they should consider all the evidence, not just that which is mentioned in the summary. *Quercia v. United States,* 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321 (1933); *Allis v. United States,* 155 U.S. 117, 15 S.Ct. 36, 39 L.Ed. 91 (1894); *Gordon v. United States, supra,* at 879–80.

In the instant case, much of the evidence was presented by Secret Service Agents testifying to a series of seemingly disjointed surveillances of moving persons and vehicles. A diagram of certain Philadelphia streets was utilized by the government to facilitate an understanding of the testimony. After five days of such testimony, the court believed that a review of the evidence would render some assistance to the jury in considering the case.

The court's charge stressed the warning that the jurors were the sole judges of the facts,[17] and any recollection that they had which was at variance with the court's must control.[18] The court also stressed that there was other testimony which was not mentioned in the review but which should be given as serious consideration as the testimony which was reviewed.[19] In explaining that the defendant has no duty to present a defense, the court instructed the jurors that the defendant may rely upon favorable evidence brought out on cross-examination of the government's witnesses.[20]

After the charge, the following colloquy took place at sidebar:

17. N.T. 551, 554–555.

18. N.T. 540.

19. N.T. 550–551.

20. N.T. 521.

21. N.T. 558.

Mr. Simone (defense counsel): Just lastly, Your Honor, even though you did attempt to, I use the word cure advisedly, your comments on the evidence by saying it was the jury's function, I object to that because Number 1, in this case the defense put on no evidence at all, so I think Your Honor should not have charged on the evidence for that reason, and, also, in your comments on the evidence you really covered the direct testimony. You did not cover the cross, but you did say, well, the defense did bring out matters on cross-examination.

Now, our theory of the case was not included in any of the comments on the evidence, whereas the Government's theory was.

The Court: I don't know what your theory is.

Mr. Simone: My theory is that the only evidence that Cicalese got the money from Caramandi came either from Angelucci from Cicalese, that nobody ever saw Cicalese get the money from Caramandi, that there is no evidence anybody ever saw that, Number 1, and Number 2, that from the time of Cicalese's arrest, when Cicalese was arrested, the money stopped coming which would infer maybe Cicalese was the source of this money, and this was brought out on cross-examination.[21]

█ It is clear from this statement of defense counsel that he did not have any particular evidence[22] in mind but merely wanted the court to restate the defendant's arguments to the jury. The court complied with this request by summarizing the defendant's contentions for the benefit of the jury.[23]

22. The jury was reminded of at least one aspect of the government's case which favored the defendant. The court pointed out that the government's principal witness was a convicted felon, an accomplice and an informer. N.T. 553.

23. N.T. 561–562.

It is well established that the volume of evidence summarized for each side is not determinative of the question whether the summary was impartial. Thus, where the government's case was much longer than the defendant's, there was no error in a summary of the government's evidence which was appropriately longer than the summary of the defendant's case. *United States v. Press,* 336 F.2d 1003 (2d Cir.1964); *United States v. Laurelli,* 293 F.2d 830 (3d Cir.1961); *United States v. Weinberg,* 226 F.2d 161 (3d Cir.1955).

And of course, where the defendant puts on no case, the court cannot summarize his evidence. *United States v. Dalli,* 424 F.2d 45 (2d Cir.1970); *United States v. Dockery,* 417 F.2d 330 (4th Cir. 1969). The defendant suggests, however, that when no evidence is presented by the defense, then the court should not summarize the evidence at all. As the court stated in *United States v. Isenberg,* 343 F.Supp. 25 (W.D.Pa.1972):

> The fact that a defendant produces less evidence than the prosecution, or no evidence at all, does not relieve a trial judge of his duty to assist the jury in arriving at a just conclusion by summarizing the evidence.

343 F.Supp. at 29.

The ABA Standards for Criminal Justice Relating to Trial By Jury § 4.7 (Tentative Draft 1968) require the judge to accurately state the contentions of both sides. This requirement was adhered to in the instant case. The standards nowhere suggest that if a defendant puts on no evidence the court should not summarize what evidence was presented. *United States v. Brandom,* 479 F.2d 830 (8th Cir.1973), cited by the defendant, is inapposite. In that case, the trial judge made statements which could have led the jury to believe that he thought the defendant's evidence was unpersuasive and inconsequential. Accordingly, I find no error on the basis of the charge to the jury.

For the foregoing reasons, the Motions of Defendant Nicholas Caramandi In Arrest of Judgment or for a New Trial were denied.