**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Harry E. CLAIBORNE,**
**Defendant-Appellant.**

**No. 84–1294.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 26, 1985.

Decided July 8, 1985.

Steven A. Shaw, Jan Nielsen Little, Public Integrity Section, Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Oscar B. Goodman, Goodman, Terry, Stein & Quintana, Las Vegas, Nev., J. Richard Johnston, Oakland, Cal., William Raggio, Reno, Nev., for defendant-appellant.

Before PELL, LUMBARD, and McWILLIAMS, Senior Circuit Judges.*

PELL, Senior Circuit Judge.

A jury sitting in Reno, Nevada, convicted defendant Harry E. Claiborne on two counts charging that defendant willfully underreported his taxable income on his 1979 and 1980 tax returns. 26 U.S.C. § 7206(1) (1967). The jury acquitted defendant of one count charging that he submitted a false statement to the Judicial Ethics Committee. 18 U.S.C. § 1001 (1976). The district court sentenced defendant to a term of two years imprisonment plus a $5,000 fine on each tax count. Defendant appeals from the judgment of conviction on the two income tax counts.

## I. THE FACTS

Defendant, who continues to hold office as a United States district judge, became a district judge for the District of Nevada on September 1, 1978. Prior to that time, defendant was engaged in a lucrative private practice in Las Vegas, Nevada, and had had an income of six figures annually. Upon entering the judiciary, defendant's annual salary was $58,000. In a 1980 letter requesting payment of legal fees he had earned before becoming a judge, defendant stated that he was in desperate financial straits. Approximately two years later, a federal grand jury in Portland, Oregon, began investigating allegations that defendant had accepted bribes from a Joseph Conforte in the performance of his official duties. Two subsequent grand juries, one again in Portland, Oregon, and one in Reno, Nevada, investigated these charges as well as allegations that defendant had understated his income in his 1979 and 1980 tax returns and had filed a false financial statement with the Judicial Ethics Committee. The term of the first Portland grand jury expired and the second grand jury there was not asked to return an indictment. The Reno grand jury, however, returned a seven count indictment against defendant, containing four charges relating to defendant's alleged bribery activities with Joseph Conforte, the two tax counts, and one count charging that defendant

---

* Wilbur F. Pell, Jr., Senior Circuit Judge for the Seventh Circuit, J. Edward Lumbard, Senior Circuit Judge for the Second Circuit, and Robert H. McWilliams, Senior Circuit Judge for the Tenth Circuit, sitting by designation.

falsely reported his finances to the Judicial Ethics Committee.

Joseph Conforte appeared as a witness before the indicting grand jury. In exchange for Conforte's testimony, and his agreement to cooperate fully in further investigations of defendant and in his prosecution, the Government agreed to recommend a substantial reduction in sentences that Conforte had previously received for tax evasion. Subsequently, a federal judge ordered reduction of Conforte's sentences.

Defendant moved to dismiss the indictment returned against him on various grounds, all of which the district court rejected. The case then proceeded to trial. The district court ultimately declared a mistrial after the jury reported that it was hopelessly deadlocked.

■ At this point, the Government voluntarily moved to dismiss the four Conforte bribery counts, stating in part: "The attorneys further believe that in the first trial of this case the presentation of evidence on Counts One, Two, Three and Four may have distracted the jury in its consideration of Counts Five, Six, and Seven and contributed to its inability to reach a verdict on those counts." Record at 204. Defendant then renewed all previous pretrial motions relating to the remaining three counts, all of which the district court denied, in some instances after a hearing. The case subsequently proceeded to trial for a second time, on the two tax counts and the count relating to the Judicial Ethics Committee. As we have noted, the jury convicted defendant on the two tax counts, but acquitted him on the count relating to the Ethics Committee.[1] Defendant challenges his conviction on a number of grounds, which we shall discuss in turn.

## II. DEFENDANT'S CONTENTIONS

### A. Judicial Immunity from Prosecution

■ Defendant's first contention deserves minimal attention from this court. Defendant contends that Articles I and III of the United States Constitution, as well as the doctrine of separation of powers, prohibit the prosecution of a federal judge without prior impeachment by Congress. The parties concede that no impeachment proceedings have been brought against defendant. Defendant filed a pretrial motion covering these contentions, which the district court denied. This Court upheld the district court's denial of defendant's motion. *United States v. Claiborne*, 727 F.2d 842 (9th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 113, 83 L.Ed.2d 56.

In upholding the denial of defendant's motion, this court relied on two cases which dismissed similar claims. *United States v. Claiborne*, 727 F.2d at 845, *citing United States v. Hastings*, 681 F.2d 706 (11th Cir. 1982), *cert. denied*, 459 U.S. 1203, 103 S.Ct. 1188, 75 L.Ed.2d 434 (1983); *United States v. Isaacs*, 493 F.2d 1124 (7th Cir.1974) (per curiam), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146. These cases squarely held that the Constitution does not immunize a federal judge from criminal prosecution prior to impeachment. *United States v. Hastings*, 681 F.2d at 710–11; *United States v. Isaacs*, 493 F.2d at 1144. In view of the reasoning in *Hastings* and *Isaacs*, and in view of our previous opinion, in this case, squarely deciding this issue adversely to defendant, we see no reason to re-examine the question here.

We remark, in addition, that defendant's suggestion that the protections guaranteed by the Constitution to criminal defendants

---

**1.** The defendant points out in his brief that the jury acquitted him on Count VII, The Judicial Ethics Committee count, but convicted him on the two tax counts, which likewise involved the reporting of income. The defendant does not directly challenge these verdicts as being inconsistent. To the extent he indirectly does so, we do not regard them as inconsistent. Count VII related to a requirement that federal judges dis-

close certain information about their property and income in an annual report. The jury may well have regarded violation of this requirement as an entirely different crime from filing false information in an income tax return, because the latter involves a failure to pay money due the Government and acutely concerns the public interest.

are inadequate to protect a federal district judge appears disingenuous from our review of the record, which appears to us to reflect that defendant was afforded a fair trial fully consistent with the protection of his constitutional rights.

### B. Intrusions into the Grand Jury's Independence

Defendant's second contention, in which he seeks dismissal of his indictment, subsumes numerous challenges relating to the manner in which the prosecution obtained the indictment. These challenges, unlike defendant's first contention, merit some discussion from this court.

### 1. The Conforte testimony and its effect on the grand jury

Defendant contends that the prosecution knowingly presented the perjurious testimony of Joseph Conforte to the indicting grand jury, and that this testimony unconstitutionally biased the grand jury against him. Defendant maintains that the prosecution intentionally failed, in examining Conforte, to require Conforte to specify the exact dates on which incidents culminating in the alleged acts of bribery occurred, because the prosecution allegedly knew that the acts did not take place. Defendant additionally maintains that the prosecution amended its request for notice of defendant's intent to rely on an alibi defense three times before trial, each time changing the dates on which the alleged acts of bribery took place, because Conforte kept changing the details of his story. These acts, defendant asserts, amounted to the knowing presentation of perjured testimony, or at least an invitation to Conforte to perjure himself before the grand jury. Defendant asserts that Conforte's perjurious testimony irreparably biased the grand jury against him, in violation of the Due Process Clause of the Fifth Amendment. Alternatively, defendant asserts that the prosecution's behavior in obtaining and presenting the Conforte testimony justifies a dismissal of defendant's indictment in the exercise of this court's supervisory power.

We begin our analysis by examining the Fifth Amendment's grand jury guarantee in federal felony trials. That guarantee ensures that, except in certain military cases, "[n]o person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. CONST. amend. V. Federal courts agree that the framers of the Bill of Rights included the grand jury guarantee in the Fifth Amendment to protect wrongfully accused defendants against mistaken and vindictive prosecutions. See United States v. Dionisio, 410 U.S. 1, 16–17, 93 S.Ct. 764, 772–773, 35 L.Ed.2d 67 (1973); Y. KAMISAR, W. LAFAVE & J. ISRAEL, MODERN CRIMINAL PROCEDURE (1980). Federal courts also agree, however, that the grand jury serves important investigative functions in addition to serving as a shield against unwarranted prosecution. United States v. Calandra, 414 U.S. 338, 343, 94 S.Ct. 613, 617, 38 L.Ed.2d 561 (1974). As the Supreme Court observed in Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) (citations omitted):

> It is a grand inquest, a body of powers of investigation and inquisition, the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime....

Id. at 688, 92 S.Ct. at 2660.

When the grand jury is performing its investigatory function into a general problem area ... society's interest is best served by a thorough and extensive investigation. A grand jury investigation is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed. Such an investigation may be triggered by tips, rumors, evidence proffered by the prosecutor, or the personal knowledge of the grand jurors. It is only after the grand jury has examined the evidence that a determination of whether

the procedures will result in an indictment can be made.

*Id.* at 701–02, 92 S.Ct. at 2667 (citations omitted).

In view of the grand jury's broad investigatory powers, and in view of the grand jury's duty not to determine guilt or innocence but to determine whether probable cause exists to believe that a crime has been committed, *United States v. Calandra,* 414 U.S. at 349, 94 S.Ct. at 620, the courts have sharply limited a defendant's ability to challenge the nature of evidence presented to a grand jury. *See Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) (holding that a grand jury witness may not refuse to answer questions on the ground that the questions were based on evidence derived from an unlawful search and seizure); *Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956) (barring a challenge based on the exclusive use of hearsay before a grand jury); *Lawn v. United States,* 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958) (prohibiting a challenge to subpoenaed evidence based on defendant's privilege against self-incrimination). In so doing, the courts have recognized that such evidentiary challenges are best resolved in the adversary arena of a criminal trial. *United States v. Short,* 671 F.2d 178, 183 (6th Cir.1982), *cert. denied,* 457 U.S. 1119, 102 S.Ct. 2932, 73 L.Ed.2d 1332. In order to ensure that trials and not pretrial inquiries into the grand jury process resolve such challenges, the courts have attached a presumption of regularity to grand jury proceedings. *See United States v. Woods,* 544 F.2d 242, 250 (6th Cir.1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 787, 50 L.Ed.2d 778 (1977); *Beverly v. United States,* 468 F.2d 732, 743 (5th Cir.1972).

■ Notwithstanding these limitations on a defendant's ability to challenge the evidence presented to a grand jury, the cases do recognize that defendants may overcome the presumption of regularity which attaches to grand jury proceedings and obtain dismissal of indictments returned against them on a proper showing of grand jury abuse. *United States v. Samango,* 607 F.2d 877, 881 (9th Cir.1979). Defendants may establish such grand jury abuse by demonstrating that the prosecutor obtained an indictment by knowingly submitting perjured testimony to the grand jury. *United States v. Thompson,* 576 F.2d 784, 786 (9th Cir.1978), *United States v. Kennedy,* 564 F.2d 1329, 1338 (9th Cir. 1977), *cert. denied,* 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978). The courts reason that such conduct is arbitrary and capricious and therefore violates due process or that such conduct must be condemned in the exercise of the courts' supervisory powers. *United States v. Al Mudarris,* 695 F.2d 1182, 1185 (9th Cir.1983), *cert. denied,* 461 U.S. 932, 103 S.Ct. 2097, 77 L.Ed.2d 305. Indeed, a decision of this court requires a prosecutor who discovers perjury by a grand jury witness after indictment to inform the defendant, the trial court, and the grand jury of the perjury so that the grand jury may reconsider its decision to indict. *United States v. Basurto,* 497 F.2d 781, 785–86 (9th Cir.1974).

■ The cases agree, however, that perjury before a grand jury must be material to justify dismissal of the indictment. *United States v. Bracy,* 566 F.2d 649, 655 (9th Cir.1977), *cert. denied,* 439 U.S. 818, 99 S.Ct. 79, 58 L.Ed.2d 109 (1978); *United States v. Bowers,* 534 F.2d 186, 193 (9th Cir.1976) (per curiam), *cert. denied,* 429 U.S. 942, 97 S.Ct. 360, 50 L.Ed.2d 311; *Coppedge v. United States,* 311 F.2d 128, 132 (D.C.Cir.1962). Moreover, courts should not presume that perjured testimony was material. *United States v. Kaplan,* 554 F.2d 958 (9th Cir.1977) (per curiam), *cert. denied,* 434 U.S. 956, 98 S.Ct. 483, 54 L.Ed.2d 315. As a consequence, if sufficient non-perjurious testimony exists to support the indictment, the courts will not dismiss the indictment due to the presence of perjured testimony before the grand jury, on the assumption that the grand jury would have returned an indictment without the perjurious evidence. *Coppedge v. United States,* 311 F.2d at 131–32. In a similar vein, other courts

confronted with evidence of perjured testimony before a grand jury presume that no prejudice thereby resulted to defendant and therefore refuse to dismiss the grand jury's indictment. *United States v. Adamo,* 742 F.2d 927, 941 (6th Cir.1984).

 In the case before us, defendant contends that the perjurious testimony of Joseph Conforte before the grand jury did result in actual prejudice because the grand jury would not have returned an indictment without it. There is no evidence to support these assertions. The defendant has made no showing, beyond mere speculation, that Conforte gave perjured testimony before the grand jury or at the first trial. Nor has he made any showing that the Government had any reason to believe that Conforte's testimony was perjured.[2] Speculation cannot justify this court's intervention into the grand jury's proceedings. *See United States v. Chanen,* 549 F.2d 1306, 1312 (9th Cir.1977) (discussing separation of powers reasons for court's refusal to intervene in grand jury proceedings), *cert. denied,* 434 U.S. 825, 98 S.Ct. 72, 54 L.Ed.2d 83. Under these circumstances, the Government's presentation of Conforte's testimony to the grand jury was not the sort of flagrant misconduct required to justify dismissal of the indictment under the Due Process Clause or our supervisory powers. *United States v. Sears, Roebuck & Co.,* 719 F.2d 1386, 1391–92 (9th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1441, 79 L.Ed.2d 762 (1984).

 Moreover, even if Conforte perjured himself before the grand jury, we note that Conforte's testimony related only to Counts I through IV of the indictment, and that the Government moved to dismiss these "Conforte" counts before proceeding to trial (for the second time) against defendant. Thus, any perjury committed by Conforte before the grand jury was not *material* to defendant's indictment on Counts V through VII and necessarily was not material to defendant's conviction on Counts V and VI. *See United States v. Bracy,* 566 F.2d 649, 656 (9th Cir.1977) (defining material perjury as evidence that creates a reasonable doubt with respect to defendant's guilt that did not otherwise exist), *cert. denied,* 439 U.S. 818, 99 S.Ct. 79, 58 L.Ed.2d 109 (1978). *See also Laughlin v. United States,* 385 F.2d 287, 291 (D.C.Cir.1967) (examining taint solely with respect to the charges of which defendant was convicted), *cert. denied,* 390 U.S. 1003, 88 S.Ct. 1245, 20 L.Ed.2d 103 (1968). Indeed, Conforte did not appear as a witness at defendant's second trial. Under these circumstances, this court perceives no prejudice resulting from the presentation of Conforte's testimony to the grand jury. In any event, there can be no claim, and there is no claim, that there was insufficient nonperjured evidence to justify the indictment of the defendant on the tax counts and the ethics count. *See Talamante v. Romero,* 620 F.2d 784, 791 (10th Cir.1980) (finding it unlikely the grand jury would have declined to indict defendant in view of the petit jury's finding of guilt after a full trial), *cert. denied,* 449 U.S. 877, 101 S.Ct. 223, 66 L.Ed.2d 99. As a result, we find that the trial judge committed no abuse of discretion in refusing to dismiss defendant's indictment due to presentation of perjury before the grand jury. *United States v. Noti,* 731 F.2d 610, 613 (9th Cir.1984).

---

**2.** We note that defendant also raises objections to the manner in which the Government procured Conforte's testimony. Specifically, defendant contends that the Government's deal with Conforte, under which Conforte agreed to testify truthfully before all grand and petit juries and the Government agreed to recommend a reduction in Conforte's previously imposed sentences for tax fraud, among other offenses, was fundamentally unfair. We disagree, and observe that the agreement did not make any or all benefits to Conforte contingent on defendant's indictment or conviction. *See United*

*States v. Dailey,* 759 F.2d 192, 197 (1st Cir.1985). Thus, the agreement did not present an invitation to perjury. *Id.* We note, in addition, that the district court correctly determined that defendant lacked standing to contest the reduction of Conforte's sentence. Finally, we note that defendant misinterprets this court's construction of the 120-day period set forth in Rule 35(b) of Federal Rules of Criminal Procedure. Contrary to defendant's assertion, this court allows reduction of sentence within a reasonable time following the expiration of 120 days. *United States v. Smith,* 650 F.2d 206 (9th Cir.1981).

### 2. *Obtaining access to defendant's tax returns for use in a non-tax case*

Next, defendant challenges the manner in which the prosecution obtained access to defendant's tax returns. Defendant asserts that the prosecution obtained access to the returns in violation of 26 U.S.C. § 6103(a), because the prosecution sought the returns for use in a judicial proceeding relating to tax administration while claiming to seek the returns for use in a non-tax case. Defendant asserts that the procedures required for disclosure in tax-related cases are more stringent than those required for disclosure in non-tax cases. Specifically, defendant contends that Internal Revenue Service guidelines require routine procedures including audits and conferences between Internal Revenue Service and Department of Justice officials before transfer of a case from the Internal Revenue Service to the Department of Justice. Defendant contends that these routine steps were not taken here and that, therefore, the prosecution should not have submitted the returns to the grand jury.

We disagree. First, although 26 U.S.C. § 6103(a) protects an individual's privacy interest in his or her tax returns and tax return information, subsections (h) and (i) of that section permit disclosure of tax returns to federal officers and employees in both tax and non-tax cases. 26 U.S.C. § 6103(a), (i) (1985 Supp.); 26 U.S.C. § 6103(h) (1980). Contrary to defendant's assertions, these subsections prescribe more severe procedures for access to tax returns in non-tax cases than in tax cases. *Id. See also United States v. Mangan,* 575 F.2d 32, 38 (2d Cir.1978), *cert. denied,* 439 U.S. 931, 99 S.Ct. 320, 58 L.Ed.2d 324.

In this case, the district court granted disclosure of defendant's tax returns to the Department of Justice pursuant to 26 U.S.C. § 6103(i) for use in the prosecution's bribery case against defendant. 26 U.S.C. § 6103(i) (1985 Supp.). We find that this disclosure was proper. We note that the prosecution could also have obtained access to the returns for use in its tax case against defendant, by virtue of section 6103(h). 26 U.S.C. § 6103(h) (1980).[3] As a result, even if the district court's disclosure of defendant's tax returns under section 6103(i) was improper, any error thereby resulting to defendant was harmless. *Cf. Davidson v. Brady,* 559 F.Supp. 456, 461 (W.D.Mich.1983). We additionally acknowledge, and concur with, the many cases holding that suppression of a defendant's tax return is an inappropriate remedy even in cases of plain error. *Marvin v. United States,* 732 F.2d 669, 673 (8th Cir.1984); *United States v. Barnes,* 604 F.2d 121, 146 (2d Cir.1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980).

### 3. *Investigation by three grand juries*

Third, defendant contends that the prosecution's presentation of the same or similar evidence to three grand juries constituted an abuse of the grand jury process in violation of *Petite v. United States,* 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960), because it bifurcated the prosecution's investigation of defendant's case. Successive grand juries impaneled in Portland, Oregon, investigated defendant's case but for the reasons stated above did not return

**3.** Although defendant claims that Internal Revenue Service guidelines specified several procedural steps to be taken prior to release of tax information in tax-related cases, defendant concedes that no case requires adherence to any such guidelines. We note that *In re Gruberg,* 453 F.Supp. 1225, (S.D.N.Y.1978), stands for a contrary proposition because the case acknowledges that a grand jury inquiry can go forward without a recommendation from the Internal Revenue Service to the Department of Justice. We note, in addition, that many cases refuse to dismiss indictments based on challenges involv-

ing a federal agency's failure to adhere to its own guidelines. *United States v. Wilson,* 614 F.2d 1224, 1227 (9th Cir.1980); *United States v. Welch,* 572 F.2d 1359, 1360 (9th Cir.1978) (per curiam); *cert. denied,* 439 U.S. 842, 99 S.Ct. 133, 58 L.Ed.2d 140. Finally, we note that defendant's challenge to the use of his tax returns in procuring his indictment resembles the type of evidentiary challenge to grand jury procedures foreclosed by the Supreme Court in *United States v. Costello,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956), and its progeny.

an indictment against him. The third grand jury, impaneled in Reno, Nevada, returned the indictment involved in this appeal.

In *United States v. Thompson*, 251 U.S. 407, 413–14, 40 S.Ct. 289, 291–92, 64 L.Ed. 333 (1920), the Supreme Court accepted the Government's contention that a grand jury's power is continuous and that adverse action or failure to act by a previous grand jury does not limit or exhaust a successor grand jury's power to investigate. Rule 6(e)(3)(C)(iii) of the Federal Rules of Criminal Procedure furthermore authorizes transfer of one grand jury's material to another grand jury without court order. FED.R.CRIM.P. 6(e)(3)(C)(iii). The Rule thus contemplates that successive grand juries may investigate the same or similar crimes. Consequently, this court holds that the prosecution's presentation of evidence to three grand juries in this case violated no procedural rule or judicially-imposed limits on a grand jury's investigatory role.

The presentation of evidence to three grand juries additionally did not violate the Supreme Court's decision in *Petite*, 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960). In *Petite*, the Supreme Court granted the *Government'*s motion to dismiss a federal indictment returned by a grand jury in violation of a Department of Justice policy forbidding successive state and federal prosecutions for the same crime. *Id.* at 530, 80 S.Ct. at 451. In *Petite*, the Supreme Court did not forbid, or even criticize the *investigation* of one crime by successive grand juries. In this case, although three grand juries investigated defendant's course of conduct, only one grand jury returned an indictment against him. The Government's presentation of evidence to these grand juries thus violated neither the letter nor the spirit of *Petite*.

■ Moreover, even if the Government's presentation of evidence to three grand juries could be considered to have violated the Supreme Court's decision in *Petite*, a *Petite* violation does not compel dismissal of an indictment. *United States*

*v. Garner*, 632 F.2d 758, 761 (9th Cir.1980), *cert. denied*, 450 U.S. 923, 101 S.Ct. 1373, 67 L.Ed.2d 351 (1981); *United States v. Smith*, 595 F.2d 1176, 1181 (9th Cir.1979); *United States v. Snell*, 592 F.2d 1083, 1087 (9th Cir.1979), *cert. denied*, 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315. As a result, this court would not order dismissal of the indictment returned against defendant even if the facts of this case presented a violation of *Petite*.

### 4. *Employment of grand jury agents*

■ Finally, defendant contends that this court must order dismissal of the indictment because the prosecution employed the service of certain "grand jury agents" in investigating this case, and thereby overrode the independence of the grand jury. We note that the foreman of the two Portland grand juries administered an oath to one Internal Revenue Service agent and four Federal Bureau of Investigation agents, to the effect that the agents would report back to the grand jury the findings of their investigations and return to the grand jury any documents of which the grand jury should be made aware. The grand jury agents served subpoenas duces tecum upon various persons, which informed those persons that they could deliver the subpoenaed documents either to the grand jury agents or to the grand jury itself. The grand jury agents additionally examined the subpoenaed documents and discussed among themselves the relevance of the subpoenaed documents to the investigation. One grand jury agent, shortly before his swearing-in, informed the recipient of such a subpoena that the grand jury would swear him in as its agent in the near future. This agent later testified at length before the indicting grand jury in Reno.

The various cases addressing the propriety of employment of grand jury agents recognize that the Federal Rules of Criminal Procedure do not authorize such grand jury personnel. *See United States v. Kilpatrick*, 594 F.Supp. 1324, 1344 (D.Colo. 1984), *appeal docketed*, No. 84–2481 (10th Cir. Oct. 24, 1984). These cases analyze

the employment of grand jury agents as a problem of unauthorized disclosure of grand jury material or as a problem of unauthorized presence during grand jury deliberations. *Id.* at 1329–30; *United States v. Carcaise,* 442 F.Supp. 1209, 1210 (M.D.Fla.1978). Both problems present violations of Rule 6 of the Federal Rules of Criminal Procedure. FED.R.CRIM.P. 6(d) (setting forth who may be present during grand jury deliberations); FED.R.CRIM.P. 6(e) (setting forth the circumstances under which, and to whom, disclosure of grand jury materials is proper). The cases acknowledge, however, that the danger arising from the employment of grand jury agents derives from the risk that such agents will override the independence of the grand jury, whether the employment of such agents is classified as an unauthorized presence or as an unauthorized disclosure. As the court noted in *United States v. Anderson,* 577 F.Supp. 223 (D.Wyo. 1983), *appeal docketed,* No. 83–2519 (10th Cir. Nov. 17, 1983) (argued April 18, 1985):

> The most important function of a grand jury is to stand between prosecuting authorities and the suspect as an unbiased valuator of evidence. That function cannot be maintained or understood by society when citizens are confronted by law enforcement agents who claim to be alter egos of the grand jury.... A grand jury that has become identified in the eyes of lay witnesses before it with law enforcement agents is not functioning independently of the prosecution. Such identification can only undermine public confidence that the grand jury is performing its constitutional function to check the power of the government.

*Id.* at 232.

Only two cases, to our knowledge, have ordered dismissal of an indictment due to the employment of grand jury agents. *United States v. Kilpatrick,* 594 F.Supp. at 1353 (D.Colo.1984) (*appeal docketed* as previously noted); *United States v. Anderson,* 577 F.Supp. at 234 (D.Wyo.1983) (*appeal docketed* as previously noted). These cases, decided by the same district judge, involved conduct of a substantially more egregious nature than that alleged here. In *Kilpatrick,* for example, the prosecutor and not the foreman of the grand jury administered oaths to the agents. 594 F.Supp. at 1328. In addition, the agents appeared together as witnesses before the grand jury, outside the presence of Government counsel. *Id.* at 1330. Moreover, the court believed that the agents had remained present during an important colloquy between the prosecutor and the grand jurors. *Id.* Finally, the court suggested that the grand jury agents in fact were using their access to grand jury materials to further civil enforcement purposes of the Internal Revenue Service. *Id.* at 1331. In *Anderson,* the grand jury agents informed recipients of grand jury subpoenas that they were agents of the grand jury. 577 F.Supp. at 232. In addition, one grand jury agent informally granted immunity to a grand jury witness. *Id.*

In this case, only one grand jury agent revealed his (future) status as a grand jury agent to one recipient of a grand jury subpoena. No grand jury agent sought to immunize the testimony of grand jury witnesses from future prosecution. Moreover, the trial court gave no indication that it thought the grand jury agents were misusing their access to grand jury materials for civil enforcement purposes. Under these circumstances, this court finds the use of grand jury agents in this case similar to the use of postal employees in *United States v. Carcaise,* 442 F.Supp. at 1212, which was to gather and summarize grand jury evidence. Like the court in *Carcaise, id.,* this court holds that the employment of grand jury agents does not justify dismissal of the indictment.

■ We note, in addition, that Federal Rule of Criminal Procedure 6(e)(3)(A)(ii) authorizes disclosure of grand jury materials to federal officials such as the Federal Bureau of Investigation and Internal Revenue Service agents who assisted the prosecution in collecting evidence for the grand jury in this case. FED.R.CRIM.P. 6(e)(3)(A)(ii). *See also In re Gruberg,* 453

F.Supp. 1225, 1233–34 (S.D.N.Y.1978). We furthermore observe that the prosecution disclosed the names of these agents to the district court. *See* Fed.R.Crim.P. 6(e)(3)(B). Because the district court, after a hearing, did not believe that these agents sought access to the grand jury's materials for purely civil purposes, and because the record itself suggests no such intention, disclosure to the agents was proper under Rule 6(e)(3)(A)(ii) and did not require a court order pursuant to Rule 6(e)(3)(C). *See generally United States v. Sells Engineering, Inc.*, 463 U.S. 418, 103 S.Ct. 3133, 77 L.Ed.2d 743 (1983). We note that the legislative history to Rule 6(e)(3)(C)(iii) suggests an assumption on the part of Congress that FBI and IRS agents would perform investigatory functions preceding grand jury indictments. S.REP. NO. 95–354, 95th Cong., 1st Sess. 6, *reprinted in* 1977 U.S.CODE CONG. & AD.NEWS 527, 530. As a result, the five FBI and IRS agents in this case properly gained access to the grand jury's material.

We find no indication in the record that any one of the five grand jury agents remained present during the grand jury's consideration of unrelated evidence or during colloquies between the prosecutor and the grand jury. Thus the record suggests no unauthorized presence violation of Rule 6(d). FED.R.CRIM.P. 6(d). The one grand jury agent who appeared as a grand jury witness properly was present before the grand jury under the terms of the Rule.

Under the circumstances of this case, we find that the employment of grand jury agents did not override the independence of the grand jury. We observe, however, that the assistance of such federal employees, though essential to the progress of many complex or controversial investigations, may raise the possibility of claims of error unnecessarily.

### C. *Sufficiency of the Evidence*

Defendant's third contention challenges the sufficiency of the Government's evidence to support the jury's guilty verdicts on Counts V and VI. Counts V and VI charged that defendant willfully subscribed, under penalties of perjury, his 1979 and 1980 tax returns even though defendant did not believe the returns to be true and correct in material matters. 26 U.S.C. § 7206(1) (1967). Specifically, Counts V and VI charged that defendant grossly underreported, in his 1979 and 1980 tax returns, the amount of legal fees he received from his prior law firm for work he had performed before becoming a judge. The Government contends that defendant received approximately $41,000 in fee income in the 1979 tax year although defendant's 1979 tax return reported that he had only received approximately $22,000 in fee income that year. The Government furthermore contends that defendant received approximately $88,000 in fee income during the 1980 tax year although defendant's 1980 return reported no fee income. Defendant maintains that the fee income which he received during the 1980 tax year was included in a $150,000 figure representing the sale price of defendant's interest in his prior law firm. The 1980 return reported the $150,000 sale price in a Schedule D in which defendant claimed a $100,000 capital loss on the sale of his interest in the firm. Defendant later conceded that the 1980 return inappropriately characterized his fee income during that year as a capital gain.

The Government proffered substantial evidence to support its claim that defendant had willfully underreported his fee income in the 1979 and 1980 returns. The Government submitted, for example, duplicates of checks sent to defendant from attorneys working for his prior law firm, representing the fee income that defendant had earned before becoming a judge. The Government also submitted various bank records setting forth amounts that defendant deposited in his personal account after he received the fee income checks. Both parties agree that defendant did not deposit all of the checks but, rather, cashed several of the checks at neighborhood casinos. The Government's evidence suggested that defendant reported on his 1979 and 1980 tax returns all checks which he depos-

ited, but failed to report any of the checks which he cashed at casinos.

The Government furthermore offered in evidence correspondence between defendant and Joseph Wright, the accountant who prepared defendant's 1979 tax return. This correspondence demonstrated that defendant supplied Wright with an estimate of his 1979 fee income which understated defendant's actual fee income by approximately $19,000. Other documentary evidence submitted by the Government demonstrated that Wright relied on this estimate in preparing defendant's 1979 tax return and in disclosing defendant's financial status to a lender from whom defendant was seeking a mortgage.

With respect to defendant's 1980 return, the Government offered as evidence defendant's sudden firing of Wright after thirty years of service and hiring of Jerry Watson, head of Creative Tax Planning. Watson prepared defendant's 1980 return, for which defendant paid Watson $2,000, as compared to the $600 fee he had paid Wright. The Government also submitted defendant's request for an extension of time to file his 1980 return, which defendant prepared himself, in which defendant estimated his tax liability would exceed $42,000. The 1980 return, however, claimed a refund in excess of $44,000. Watson completed the 1980 return in pencil, and left erratic marks in the margin of the return and elsewhere. Defendant's counsel conceded at oral argument that the return cried out for an audit.

Defendant did not seek to rebut all of the evidence offered by the Government to prove that defendant willfully understated his 1979 and 1980 taxable income. Rather, defendant, while testifying at trial, consistently asserted that the understatements were not willful because he relied in good faith on the expertise of Wright and Watson when he signed his 1979 and 1980 returns. Defendant maintains that he made full disclosure to Wright and to Watson of all income he received during these years, and that he justifiably relied on their tax advice when he signed the returns which they had prepared for him. A major dispute between the parties at trial centered around a letter allegedly delivered personally by defendant's secretary to Wright in which defendant claims to have disclosed accurately his 1979 fee income. Defendant's secretary, Judy Ahlstrom, testified that she delivered the letter to Wright's office. Wright testified at trial that he did not receive the letter and that he never lost documents from his clients.

With respect to his 1980 return, defendant contends that his sudden hiring of Jerry Watson does not indicate an intent to understate his fee income, but simply a lawful desire to change accountants. Defendant asserts that the fee paid to Watson was not unreasonably high, but rather that the fee charged by Wright was unreasonably low. Defendant maintains that he innocently relied on Watson's ability to prepare correctly his 1980 return, and, because defendant was generally ignorant of the niceties of the tax law, he had no reason to doubt its accuracy. All of this, defendant contends, proves a lack of willfullness on his part in subscribing his name to the 1980 return.

There is no claim, however, that Judge Hoffman erred in charging the jury. Therefore we have only to decide whether the Government presented enough evidence from which a jury rationally could have concluded that Claiborne willfully filed false income tax returns. We regard the Government's evidence as ample.

■ Proof of willfulness is essential to support a conviction under section 7206(1). *United States v. Bishop,* 412 U.S. 346, 361, 93 S.Ct. 2008, 2017, 36 L.Ed.2d 941 (1973); *United States v. Pallan,* 571 F.2d 497, 501 (9th Cir.1978). To prove willfulness, the Government must show that defendant intended to violate the law or knew that his actions would do so. *United States v. Pomponio,* 429 U.S. 10, 12, 97 S.Ct. 22, 23, 50 L.Ed.2d 12 (1976) (per curiam). The cases make clear that neither a careless disregard whether one's actions violate the law nor gross negligence in signing a tax return will suffice. *United*

*States v. Loney,* 719 F.2d 1435, 1436 (9th Cir.1983). The Government, however, may base its proof of willfulness on circumstantial evidence indicating that defendant knew or must have known that his returns were false. *Black v. United States,* 309 F.2d 331, 342 (8th Cir.1962) (inferring willfulness from any conduct the likely effect of which is to mislead or conceal).

 In addition, a defendant may rebut the Government's proof of willfulness by establishing good faith reliance on a qualified accountant after full disclosure of tax-related information. *Bursten v. United States,* 395 F.2d 976, 981 (5th Cir.1968), *cert. denied,* 409 U.S. 843, 93 S.Ct. 44, 34 L.Ed.2d 83 (1972). As the Seventh Circuit recently observed in *United States v. Whyte,* 699 F.2d 375 (7th Cir.1983):

> It is a valid defense to a charge of filing a false return if a defendant provides full information regarding his taxable income and expenses to an accountant qualified to prepare federal tax returns, and ... the defendant adopts and files the return as prepared without having reason to believe it is incorrect.

*Id.* at 379.

On the other hand, a defendant cannot shift his responsibility for deficiencies to an accountant if the defendant has withheld vital information or has taken steps to mislead his accountant. *United States v. Garavaglia,* 566 F.2d 1056, 1060 (6th Cir. 1977); *Bender v. Commissioner,* 256 F.2d 771, 774 (7th Cir.1958).

 In the case of Claiborne's 1979 tax return, the parties hotly disputed whether defendant made full disclosure of his 1979 fee income to Joseph Wright. As we have noted, defendant claims that he made full disclosure in a letter delivered by his secretary to Wright's office. Wright, on the other hand, testified that he received no such letter. The resolution of that factual dispute was of course for the jury and we see no basis to question its determination to credit Wright's testimony over that of Claiborne and his secretary. Because we must draw all reasonable inferences from the evidence in favor of the Govern-

ment, we cannot find that the jury incorrectly disregarded defendant's reliance defense. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 57 L.Ed.2d 1 (1979); *United States v. Beecroft,* 608 F.2d 753, 756 (9th Cir.1979); *Cosby v. Jones,* 682 F.2d 1373, 1382 (11th Cir.1982). We observe, in addition, that the jury, in viewing the Government's evidence that defendant incorrectly stated his 1979 fee income in a different letter to Wright and the Government's evidence that defendant failed to report any checks cashed at casinos, may have decided that defendant deliberately sought to mislead Wright and therefore was not entitled to invoke the reliance defense. *United States v. Scher,* 476 F.2d 319, 321 (7th Cir.1973). We observe that the amounts of the checks defendant cashed at casinos were large (in one instance as large as $3,000), appearing to be more than mere pocket money. We therefore determine, after reviewing evidence, that a rational trier of fact could have found defendant guilty beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. at 319, 99 S.Ct. at 2789; *Burks v. United States,* 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978).

 We base our conclusion with respect to the 1980 return on similar grounds. Here, the crucial issue before the jury was not whether defendant made full disclosure to Jerry Watson, but rather whether he relied in good faith on Watson's advice. Defendant's own understanding of tax issues is highly relevant to the question of his good faith reliance on Jerry Watson. *See United States v. Whyte,* 699 F.2d at 380. The parties agree that defendant presided as district court judge over some tax law disputes. Nevertheless, defendant consistently has maintained that he is not a tax expert and has had no significant experience with the distinction between ordinary income and capital gain.

The jury obviously did not believe defendant and found his claims of ignorance to be disingenuous. The support for that conclusion is strong. We assume that de-

fendant gained some familiarity with concepts as basic to the tax law as the distinction between ordinary income and capital gain during his law school studies, his thirty odd years of practicing law, and his three years on the bench before filing the 1980 return. *Compare Lurding v. United States,* 179 F.2d 419, 420 (6th Cir.1950) (where defendant was uneducated and unfamiliar with taxes, bookkeeping and accounting). We note that defendant reported his fee income as ordinary income in all years previous to 1980, when he reported the income as a capital gain. We observe, in addition, that defendant reviewed the 1980 return for ten or fifteen minutes before signing his name to it. During this time, defendant must have seen, at the least, that Watson had completed the return erratically, and in pencil. Defendant most likely also observed at this time that Watson's return reported no fee income.

■ In reviewing the jury's decision to convict, we must draw all reasonable inferences from the evidence in favor of the Government. *United States v. Spetz,* 721 F.2d 1457, 1477 (9th Cir.1983). On this record, we have no trouble concluding that a rational trier of fact could have found defendant guilty of Count V and Count VI beyond a reasonable doubt. *See United States v. Des Jardins,* 747 F.2d 499, 507 (9th Cir.1984).

## D. Trial Errors

Defendant's final contentions on appeal relate to various alleged errors made by the district court prior to and during defendant's second trial. Four of these alleged errors merit discussion.

### 1. *Failure to excuse for cause two prospective jurors*

First, defendant asserts that the district court's refusal to excuse for cause two prospective members of the jury unconstitutionally forced him to exercise two of his allotted peremptory challenges, all of which he eventually exhausted, thereby forfeiting his right to exercise those challenges against two other veniremen and impairing his Sixth Amendment right to an impartial jury. *See United States v. Martin,* 749 F.2d 1514, 1518 (11th Cir.1985). Defendant contends that these two prospective jurors exhibited actual bias towards him and thus the district court should have granted his motions to excuse them from jury service for cause. Defendant also claims that the district judge asked these two prospective jurors leading questions, which did not elicit objectively whether the jurors could decide the case without bias or prejudice. We disagree with this characterization of the judge's colloquies with the jurors and find that the judge fairly gave them the opportunity to reveal, without embarrassment, any bias or prejudice which they felt against defendant.

■ Defendant does not contend, however, that the jury which convicted him was biased. Rather, his objection to the district court's failure to exclude the two prospective jurors rests on the theory that it is constitutionally impermissible to force defendants to exhaust their peremptory challenges on persons who should be excused for cause. *See United States v. Daly,* 716 F.2d 1499, 1507 (9th Cir.1983), *cert. dismissed,* — U.S. —, 104 S.Ct. 1456, 79 L.Ed.2d 773 (1984); *United States v. Allsup,* 566 F.2d 68, 71 (9th Cir.1977). We agree, and reaffirm that the peremptory challenge is an important safeguard of a defendant's Sixth Amendment right to an impartial trial. *See Hines v. Enomoto,* 658 F.2d 667, 672 (9th Cir.1981); *United States v. Giacalone,* 588 F.2d 1158, 1164 (6th Cir.1978), *cert. denied,* 441 U.S. 944, 99 S.Ct. 2162, 60 L.Ed.2d 1045 (1979). *See also Rosales-Lopez v. United States,* 451 U.S. 182, 188 n. 6, 101 S.Ct. 1629, 1634 n. 6, 68 L.Ed.2d 22 (1981); *Swain v. Alabama,* 380 U.S. 202, 219, 85 S.Ct. 824, 835, 13 L.Ed.2d 759 (1965).

■ Even though this court agrees that forcing a defendant to expend peremptory strikes may implicate the Sixth Amendment, *Celestine v. Blackburn,* 750 F.2d 353, 360 (5th Cir.1984), a constitutional problem only arises in cases where a pro-

spective juror upon whom defendant spent a peremptory challenge was actually biased and therefore should have been excluded by the trial judge. *United States v. Allsup*, 566 F.2d at 71. That is not the case here. One prospective juror, Robert Whitten, indicated during voir dire that he had a preconception of defendant's guilt or innocence and that defendant would have to come forward with evidence to overcome this preconception. The trial judge then instructed Whitten that a criminal defendant enjoyed a constitutional presumption of innocence and made clear to Whitten that defendant did not have to come forward with proof of innocence but rather the prosecution had to come forward with proof of defendant's guilt beyond a reasonable doubt. Whitten subsequently indicated that he would decide defendant's guilt or innocence impartially, on the evidence presented at trial and according to the law charged by the court.

A second prospective juror, Susan Varnum, indicated during voir dire that she did not like defendant's appearance and admitted that she had formed an opinion on defendant's guilt or innocence as a result of the media coverage of defendant's case. Varnum also indicated, however, that she did not believe in trying cases through the newspapers and that defendant would not have a burden to overcome due to her personal attitude towards his appearance. Varnum furthermore expressed to the trial court that she was willing and able to judge the evidence in the case in an impartial manner.

Under these circumstances, we cannot find that the district court committed a manifest error or an abuse of its broad discretion in failing to excuse for cause jurors Whitten and Varnum. *Celestine v. Blackburn*, 750 F.2d at 360; *United States v. Giacalone*, 588 F.2d at 1164. Few aspects of a jury trial are more committed to a district court's discretion than the decision whether to excuse a prospective juror for actual bias. *United States v. Gullion*, 575 F.2d 26, 29 (1st Cir.1978). Moreover, trial courts possess a peculiar ability to determine whether a prospective juror's claimed ability to decide a case impartially is genuine. *Patton v. Yount*, —— U.S. ——, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). A prospective juror's statement that he has some impression about the case or a party is a frank and honest answer to the court's inquiry, and the juror's statement that he can lay aside his impressions and decide the case on the evidence presented and the charge of the court should also be weighed in the discretion of the trial judge.

Here, the district court determined, based on the prospective jurors' responses, that Whitten and Varnum would weigh the evidence in the case impartially despite their initial preconceptions of defendant's guilt or innocence. We do not find this decision an abuse of the district court's discretion. Indeed, the fact that defendant took advantage of his peremptory challenges to strike Whitten and Varnum may reflect "not a denial of justice," but a proper utilization of the peremptory tool. *United States v. Giacalone*, 588 F.2d at 1164.

2. *Failure to order disclosure of Jencks Act statements*

Second, defendant contends that the district court committed reversible error because the court erroneously declined to provide the defense, pursuant to the terms of the Jencks Act, 18 U.S.C. § 3500 (1985), certain "302" summaries of FBI interviews with a key Government witness, concluding that the summaries did not contain material subject to disclosure under the Act. Specifically, defendant maintains that the district court improperly refused to disclose statements made by Joseph Wright to FBI agents during interviews with Wright prior to trial. Defendant contends that these statements would have impeached Wright's trial testimony and, because Wright's testimony materially affected the jury's decision to convict him, that the court's refusal to disclose these statements prejudicially affected defendant's substantial rights.

One such statement suggested that Wright had misplaced or destroyed pre-

1976 records during his move to a new office. Wright testified that he did not lose or misplace any records pertaining to defendant. Defendant maintains that Wright's loss of pre-1976 records may have suggested to the jury the possibility that Wright mistakenly included a letter written by defendant to Wright in 1980 in the records that Wright lost or destroyed before he moved to new quarters. Other statements included a reference by Wright to a Mr. Swanson, who helped Wright in his accounting business, a statement by Wright that he did not "cross-examine" his clients, and a statement by Wright that his work for defendant decreased when defendant became a judge. The trial court refused to order disclosure of this material on the ground that the summaries containing this material were not in fact "statements" by witness Wright.

In reviewing the district court's refusal to disclose the 302 forms to defendant, this court must ponder two questions. First, we must consider whether the 302 forms included "statements" of witness Wright within the meaning of the Jencks Act. Second, we must consider whether, assuming the 302 forms did contain such statements, the district court's refusal to order their disclosure prejudicially affected defendant's substantial rights. *United States v. Long,* 715 F.2d 1364, 1368 (9th Cir.1983).

■ The Jencks Act restrictively defines those "statements" by a witness which are subject to disclosure. Specifically, the Act provides:

The term "statement," as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—

(1) a written statement made by said witness and signed or otherwise adopted or approved by him;

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury. 18 U.S.C. § 3500(e) (1985). The 302 summaries of interviews conducted by Government agents with witness Wright cannot fall within subsection (1) of 18 U.S.C. § 3500(e) because Wright did not draft the summaries or otherwise approve their contents. *Compare Goldberg v. United States,* 425 U.S. 94, 103, 96 S.Ct. 1338, 1344, 47 L.Ed.2d 603 (1976). Indeed, the record is bereft of evidence to suggest that Wright saw the 302 forms at all. Similarly, the 302 summaries cannot fall within subsection (3) of 18 U.S.C. § 3500(e) because Wright did not make any "statements" contained therein to a grand jury. 18 U.S.C. § 3500(e)(3) (1985).

■ Furthermore, this court finds that the 302 summaries do not fall within subsection (2) of 18 U.S.C. § 3500(e) because the summaries do not purport to transcribe in a substantially verbatim fashion Wright's various interviews with Government agents. Rather, the summaries represent, in our view, the *agents'* selection of certain information conveyed by Wright for possible use in the Government's case against defendant. *See Palermo v. United States,* 360 U.S. 343, 355 n. 12, 79 S.Ct. 1217, 1226 n. 12, 3 L.Ed.2d 1287 (1959) (characterizing an agent's 600 word summary of a 3½ hour conference with a Government witness as the agent's selection of items deemed appropriate for inclusion rather than a virtually verbatim narrative of what the witness said). *Accord United States v. Bernard,* 625 F.2d 854, 859 (9th Cir.1980); *United States v. Edwards,* 702 F.2d 529, 531 (5th Cir.1983); *United States v. Durham,* 587 F.2d 799, 802 (5th Cir.1979). The summaries additionally fail to satisfy the requirements of 18 U.S.C. § 3500(e)(2) because the agents did not draft them contemporaneously with Wright's responses during the interviews. 18 U.S.C. § 3500(e)(2) (1985). We believe that the district court properly characterized the summaries as non-Jencks Act material and, therefore, correctly declined to

disclose their contents to defendant. Under these circumstances, we cannot find, as we must to overturn a district court's Jencks Act decision, that the district court's characterization was clearly erroneous, *United States v. Hodges*, 556 F.2d 366, 368 (5th Cir.1977), *cert. denied*, 434 U.S. 1016, 98 S.Ct. 735, 54 L.Ed.2d 762 (1978), or an abuse of discretion, *Government of Virgin Islands v. Lovell*, 410 F.2d 307, 310 (3d Cir.1969), *cert. denied*, 396 U.S. 964, 90 S.Ct. 440, 24 L.Ed.2d 428.

■ Moreover, even if the district court's refusal to disclose the summaries to defendant was clearly erroneous or an abuse of discretion, we do not believe that the district court's decision prejudicially affected defendant's substantial rights. *United States v. Johnson*, 521 F.2d 1318, 1320 (9th Cir.1975). The only information contained in the summaries that could be damaging to Wright's credibility, and therefore helpful to the defense, is Wright's admission that he lost or mislaid some records during his move to a new office.[4] The record demonstrates, however, that defendant did cross-examine Wright with respect to this loss of records at defendant's first trial. Thus, defendant had knowledge of the loss and made use of that knowledge without access to the summaries. Under these circumstances, the court's refusal to disclose the summaries to defendant did not prejudice defendant's substantial rights. *Government of Virgin Islands v. Lovell*, 410 F.2d at 311. *See also United States v. Johnson*, 521 F.2d at 1320.

### 3. *The prosecution's failure to disclose Brady material*

■ Third, defendant contends that the prosecution's failure, following defendant's request, to deliver these 302 summaries of interviews between Government agents and Wright deprived defendant of a fair trial under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Prior to trial, defendant requested from the Government any statements in its possession which would tend to impeach the credibility of any Government witness, including but not limited to statements contradicting other statements by such persons. Defendant asserts that the 302 summaries contained such impeachment evidence, because the summaries suggested, among other things, that Wright may have misplaced important correspondence that he had received from defendant. Wright testified at trial that he never lost records pertaining to defendant. Defendant contends that the prosecution's failure to disclose this material might have affected the jury's verdict and consequently demands a new trial.

The Supreme Court's decision in *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), provides the framework for our analysis of the prosecution's failure to disclose this impeachment evidence. In *Agurs*, the Supreme Court reaffirmed its holding in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), that due process requires a prosecutor to disclose material exculpatory information in its possession to the defense. *Id.* at 105–06, 96 S.Ct. at 2398–99. The Supreme Court announced different "materiality" tests, however, according to the specificity of a defendant's request for information. *Id.* at 106, 112, 96 S.Ct. at 2398–2401. If a defendant made a specific request for exculpatory information, which gave the prosecution notice of exactly what the defendant desired, undisclosed exculpatory information would be material if it might have affected the outcome of defendant's trial. *Id.* at 106, 96 S.Ct. at 2398. On the other hand, if a defendant made either a general request for exculpatory information or made no request, the undisclosed exculpatory information would not be ma-

---

**4.** Ordinarily, the Jencks Act discourages courts from speculating on what use defendants would make of witness statements. *United States v. Bibbero*, 749 F.2d 581, 585 (9th Cir.1984). In the case before us, however, defendant concedes that he would have used the information relating to Wright's loss of pre-1976 records to impeach Wright's testimony that he never lost records pertaining to defendant.

terial unless it created a reasonable doubt that did not otherwise exist. *Id.* at 112, 96 S.Ct. at 2401.

Defendant's request for information in the Government's possession which would tend to impeach the credibility of any Government witness was a general and not a specific request. *See United States v. Shelton,* 588 F.2d 1242, 1249 n. 10 (9th Cir.1978) (characterizing a request for everything tending to impeach the credibility of an *identified* witness as a general request) *cert. denied,* 442 U.S. 909, 99 S.Ct. 2822, 61 L.Ed.2d 275 (1979); *Ostrer v. United States,* 577 F.2d 782, 786 (2d Cir. 1978) (characterizing a request for material useful to cross-examine an *identified* witness with respect to bias as a general request) *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1018, 59 L.Ed.2d 73 (1979); *United States v. DiCarlo,* 575 F.2d 952, 959 (1st Cir.1978) (characterizing a request for all evidence favorable to defendant, including impeachment evidence, as a general request) *cert. denied,* 439 U.S. 834, 99 S.Ct. 115, 58 L.Ed.2d 129. We note that defendant's request did not focus on a particular witness, *United States v. Mackey,* 571 F.2d 376, 389 (7th Cir.1978), or on particular sources of witness statements, such as 302 forms. *Compare United States v. Warhop,* 732 F.2d 775, 778 (10th Cir.1984). Under these circumstances, we find that defendant's request did not give the prosecution notice of exactly what information defendant desired. *United States v. Agurs,* 427 U.S. at 106, 96 S.Ct. at 2398.

Because defendant's request was general and not specific, the prosecution's failure to disclose the impeachment evidence contained in the 302 summaries will only justify a new trial if the evidence would have created a reasonable doubt that did not otherwise exist. *United States v. Agurs, Id.* 427 U.S. at 112, 96 S.Ct. at 2401. *See also United States v. Lasky,* 548 F.2d 835, 839 (9th Cir.1977) (per curiam), *cert. denied,* 434 U.S. 821, 98 S.Ct. 63, 54 L.Ed.2d 77. Under the circumstances of this case, we find that disclosure of the evidence would have created no such doubt. We acknowledge, of course, that credibility evi-

dence can be material. *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). We acknowledge, in addition, that nondisclosure which impairs a defendant's ability effectively to cross-examine key witnesses may threaten to deprive a defendant of a fair trial. *Bagley v. Lumpkin,* 719 F.2d 1462, 1464 (9th Cir. 1983), *reversed on other grounds,* — U.S. —, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

Nevertheless, we find that the prosecution's failure to disclose the 302 summaries in this case did not impair defendant's ability to cross-examine Wright effectively because defendant in fact had access to the most damaging impeachment evidence contained in the summaries and used this evidence to impeach Wright's credibility at the first trial. *Cf. United States v. Peters,* 732 F.2d 1004, 1009 (1st Cir.1984). Accordingly, the prosecution's disclosure of the impeachment evidence contained in the summaries would have told defendant nothing of importance that he did not know already. *United States v. Truong Dinh Hung,* 667 F.2d 1105, 1107 (4th Cir.1981) (per curiam), *cert. denied,* 454 U.S. 1144, 102 S.Ct. 1004, 71 L.Ed.2d 296 (1982). Under these circumstances, we cannot find that the prosecution's failure to turn over the 302 summaries to defendant deprived defendant of a fair trial. *Cf. United States v. Prior,* 546 F.2d 1254, 1259 (5th Cir.1977).

Indeed, we would reach the same conclusion even if we construed defendant's request for impeachment evidence as a specific request, as one decision from this circuit advises us to do. *United States v. Goldberg,* 582 F.2d 483, 489 (9th Cir.1978), *cert. denied,* 440 U.S. 973, 99 S.Ct. 1538, 59 L.Ed.2d 790 (1979). Because the impeachment evidence was duplicative of information that defendant possessed prior to his second trial, we cannot find that the prosecution's failure to disclose the impeachment evidence was "material" to defendant's conviction under either standard enunciated in *Agurs. United States v. Agurs,* 427 U.S. at 106, 112, 96 S.Ct. at 2398, 2401. As a result, we hold that the district court correctly determined that any failure to

disclose which occurred in this case did not justify a new trial.

### 4. *Improper sequestration of a defense witness*

■ Finally, defendant contends that the district court committed an abuse of discretion by improperly sequestering defense witness Judy Ahlstrom during a brief recess in the middle of her testimony concerning her alleged delivery to Wright of a letter from Claiborne disclosing the full extent of his 1979 fee income. As we indicated previously, Ahlstrom was, and apparently still is, defendant's secretary of many years. Defendant asserts that the trial judge prevented defense counsel from calming Ahlstrom during this recess, even though Ahlstrom had become visibly upset during her previous testimony. Because Ahlstrom's testimony, and her credibility, were crucial to defendant's case, defendant maintains that the trial court's refusal to allow defense counsel to calm her during this recess prejudicially affected the outcome of defendant's trial. We are not unmindful of the fact that this was the only instance of witness sequestration during defendant's trial. We are not persuaded, however, given the circumstances of this case, and Ahlstrom's obvious problems during her testimony, that her sequestration amounted to reversible error.

The record does not disclose why the trial judge ordered a recess, although it does reflect the court's determination that a recess at that particular time was an urgent necessity. This court will not engage in speculation as to the trial court's motives. Rather, we note the broad discretion enjoyed by a trial judge with respect to the mode of interrogating witnesses and presenting evidence, FED.R.EVID. 611(a), and emphasize that this discretion includes the ability to order a recess as circumstances necessitate. This broad discretion over the mechanics of a trial furthermore includes the ability to order sequestration of a witness. *See Geders v. United States,* 425 U.S. 80, 87, 96 S.Ct. 1330, 1334, 47

L.Ed.2d 592 (1976). In *Geders,* The Supreme Court observed:

> Our cases have consistently recognized the important role the trial judge plays in the federal system of criminal justice. The judge is not a mere moderator but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law. A criminal trial does not unfold like a play with actors following a script; there is no scenario and can be none. The trial judge must meet situations as they arise and to do this must have broad power to cope with the complexities and contingencies inherent in the adversary process.... The judge's power to control the progress and, within the limits of the adversary system, the shape of the trial includes broad power to sequester witnesses before, during and after their testimony.

*Id.* at 86–87, 96 S.Ct. at 1334–1335. The Court held, however, that this broad power to sequester a witness did not include the power to impair a *defendant*'s right to the effective assistance of counsel by ordering a defendant not to discuss his trial with his attorney during a significant recess. *Id.* at 91, 96 S.Ct. at 1336. *Accord United States v. Romano,* 736 F.2d 1432, 1435 (11th Cir. 1984). We note that the trial court's sequestration of witness Ahlstrom did not impinge upon defendant's Sixth Amendment right to the effective assistance of his counsel in this case. Thus, defendant's reliance upon cases precluding sequestration of *defendants* on Sixth Amendment grounds is misplaced.

Our research reveals only one case in which a court has held that sequestration of a non-party witness may constitute reversible error under *Geders. United States v. Romano,* 736 F.2d, at 1439. In that case, the Eleventh Circuit reversed a defendant's conviction because the trial court had prevented his co-defendant, whose testimony was crucial to the first defendant's case, from communicating with his attorney with respect to his own testimony during a recess which lasted several days. *Id.* The court limited its holding to

the peculiar facts of the case, however, and remarked that its holding "by no means implie[d] that a co-defendant's conviction typically will be reversed on *Geders* grounds." *Id.*

We see no reason to extend the Eleventh Circuit's holding to the facts of this case. We note that the recess in this case was brief and that Ahlstrom resumed her testimony immediately after the recess ended. The trial judge apparently ordered Ahlstrom sequestered during the recess in order to prevent improper influences upon her testimony, a purpose endorsed by the Supreme Court in *Geders*. *Geders v. United States*, 425 U.S. at 87, 96 S.Ct. at 1334. Under the circumstances of this case, we find that the trial court's sequestration of Ahlstrom during a brief recess was a proper exercise of discretion.

### III. CONCLUSION

This court holds, having considered all of the claimed errors meriting attention:

(1) that Articles I and III of the Constitution did not render defendant immune from prosecution,

(2) that the Government did not engage in unconstitutional abuse of the grand jury process,

(3) that the evidence presented at trial was sufficient to sustain defendant's conviction, and

(4) that various alleged trial errors do not mandate a new trial.

We have considered other errors advanced by defendant, explicitly or implicitly, including a suggestion that he was the victim of selective prosecution; that the trial judge improperly refused to consider the effect of the trial's publicity in the Nevada newspapers (some of which was unfavorable to the *Government*); the unusual extent to which the Government gave concessions to Conforte; the Government's treatment of an IRS agent who apparently did not favor an investigation of defendant; and grand jury investigations of other persons associated with defendant. Because

we find on the record an insufficient basis to justify reversal of defendant's conviction on these and other grounds, this court accordingly AFFIRMS the judgment of conviction on Counts V and VI.