ESTATE OF JACK W. SHUMAN, DECEASED, NANCY R. SHUMAN, ADMINISTRATRIX C.T.A., ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Estate of Shuman v. Commissioner
Docket Nos. 2776-91, 2777-91, 13019-91
United States Tax Court
T.C. Memo 1995-327; 1995 Tax Ct. Memo LEXIS 329; 70 T.C.M. (CCH) 114; July 20, 1995, Filed *329 Decisions will be entered for respondent. Alvin M. Hitt, Jr., for petitioners. William R. McCants, for respondent. SWIFT
SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: Respondent determined deficiencies in and additions to decedent, Jack W. Shuman's, and petitioner, Nancy R. Shuman's, Federal income taxes as follows: Additions to Tax Sec. Sec. Sec. 6653(b)(1) 6653(b)(1)(B)
Sec.
Year
Deficiency
6653(a)(1)(A)
6653(b)(1)(A)
6653(b)(2) 6661
1984
* $ 11,686
$ --
$ 5,843
**
$ 2,922
1985
20,434
--
10,300
**
5,150
1986
6,986
--
25,769
**
8,590
1987
28,831
50
20,875
**
6,958
1988
20,881
--
15,661
--
5,220
After settlement, the primary issues for decision are: (1) Whether income earned from a gas station should *330 be computed under the cash method of accounting or under the accrual method of accounting; [2] (2) whether, in the computation of income earned from the gas station, respondent's use of a 12-cent per gallon markup was reasonable; and (3) whether decedent fraudulently underreported taxable income earned from the gas station. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated and are so found. At the time they filed their petition, decedent and petitioner, Nancy R. Shuman, resided in Pembroke, Georgia. In 1973, decedent and petitioner were married. On July 24, 1993, decedent died, and on October 13, 1993, petitioner was appointed administratrix of decedent's estate (hereinafter *331 references to petitioners are to Nancy R. Shuman and decedent's estate). In the 1950's, decedent formed Shuman Supplies, Inc., as a Georgia corporation to operate a building supply company. This company became successful, and by the mid 1960's it operated stores in five Southeastern States. For a period of 9 years during the late 1950's and early 1960's, decedent was a Representative in the Georgia House of Representatives. In 1982, decedent opened, as a sole proprietorship, a gas station near Pembroke, Georgia (the Station). Decedent, assisted by a few employees, was responsible for day-to-day operation of the Station. At the Station, unleaded, regular, and diesel gasoline were sold, as well as tobacco products and groceries. Decedent purchased gasoline at wholesale prices from Colonial Oil Co. (Colonial) for resale at the Station. Decedent maintained a bank account with respect to the Station at the Pembroke State Bank. For 1984, 1985, 1986, and 1987, total bank deposits into the Station's bank account were $ 866,234, $ 919,903, $ 682,593, and $ 794,497, respectively. From 1982 through 1988, decedent employed John L. Anchors (Anchors), a Certified Public Accountant, to prepare *332 decedent's individual Federal income tax return for 1984 and decedent and petitioner's joint Federal income tax returns for 1985, 1986, 1987, and 1988. In connection with Anchors' preparation of decedent's Federal income tax returns for 1982, 1983, and 1984, decedent did not inform Anchors that decedent owned and operated the Station nor that decedent was married. Anchors, therefore, prepared decedent's individual Federal income tax returns for 1982, 1983, and 1984 without reflecting any information on the returns pertaining to the Station. As a result, on decedent's 1982, 1983, and 1984 individual Federal income tax returns, decedent's income from operation of the Station was not reported. No Schedule C relating to the Station was attached to decedent's returns, and decedent's filing status on the returns was indicated as single. For 1983, 1984, and 1985, decedent also did not report, nor did he timely pay, Federal excise taxes due on diesel gasoline sold at the Station, and in March of 1986, respondent assessed against decedent for those years Federal excise tax deficiencies of $ 9,986, $ 8,344, and $ 12,319, respectively, and certain penalties, with respect to diesel gasoline *333 sold at the Station. In 1986, decedent paid the above Federal excise tax deficiencies and penalties. On decedent and petitioner's 1986 joint Federal income tax return, decedent and petitioner deducted the amount decedent paid in 1986 with respect to the above Federal excise tax deficiencies and penalties. In 1986, after respondent audited decedent with respect to the above Federal excise tax deficiencies on diesel gasoline sold at the Station, decedent informed Anchors that decedent owned and operated the Station and that decedent was married. Thereafter, on decedent and petitioner's joint Federal income tax returns for 1985, 1986, 1987, and 1988, that were also prepared by Anchors, some income and expenses relating to operation of the Station were reported, and a Schedule C relating to the Station was attached to each return. In order to enable Anchors to prepare decedent and petitioner's joint Federal income tax returns for 1985, 1986, 1987, and 1988, decedent gave to Anchors handwritten notes purportedly reflecting annual sales, purchases, and expenses relating to gasoline, beer, tobacco products, and groceries sold at the Station. Decedent did not maintain adequate books and *334 records with regard to sales, purchases, expenses, and other information relating to operation of the Station, and decedent did not provide Anchors with any books and records of the Station supporting the figures reflected on the handwritten notes. For 1985, 1986, 1987, and 1988, for Federal income tax purposes, Anchors computed decedent's income from the Station based solely on information that was reflected on the handwritten notes given to him by decedent. The figures reflected on the handwritten notes did not reflect accurately the wholesale cost of gasoline purchased by decedent nor the retail sales of gasoline made by decedent. On the Schedule C relating to the Station that was attached to decedent and petitioner's 1985 joint Federal income tax return, the cash method of accounting was indicated as the method of accounting used to compute income and expenses from the Station. On the Schedules C attached to decedent and petitioner's 1986 and 1987 joint Federal income tax returns, no method of accounting with respect to the Station was indicated. On the Schedule C attached to decedent and petitioner's 1988 joint Federal income tax return, the cash method of accounting was *335 again indicated as the method of accounting used to compute income and expenses of the Station. On decedent and petitioner's 1985 and 1986 joint Federal income tax returns, income averaging was used to compute income taxes due. In 1987, decedent and petitioner received $ 3,566 as taxable income from their involvement and apparent victory in an antitrust lawsuit. In 1987, respondent began an audit of decedent's 1984 Federal income tax return and of decedent and petitioner's 1985 and 1986 joint Federal income tax returns. Respondent later expanded the audit to include decedent and petitioner's 1987 and 1988 joint Federal income tax returns. Respondent's audit focused primarily on decedent's income from the Station. Respondent used the percentage markup method to recompute gross sales from gasoline, and respondent used the cash method of accounting to recompute decedent's income and expenses of the Station. Using sales invoices obtained from Colonial with respect to the Station, respondent determined for each year the number of gallons and the per gallon wholesale cost of gasoline decedent purchased from Colonial. Respondent assumed that all of the gasoline decedent purchased in a *336 particular year was resold in the same year. To compute decedent's gross sales of gasoline in 1984, 1985, 1986, and 1987, respondent used a markup of 12 cents per gallon above decedent's wholesale cost. As the basis for using a 12-cent markup, respondent relied on two reports -- one published by the Oil and Gas Journal and one published by the U.S. Department of Energy -- and respondent relied on information obtained from decedent's competitors, all of which indicated that a 12-cent markup was the industry norm. Under respondent's computation using a 12-cent markup, decedent's gross income for each year from resale of gasoline represented between 11 and 17 percent of decedent's gross sales of gasoline. To compute decedent's gross sales of gasoline from the Station for 1988, respondent used the prices indicated on gasoline pumps at the Station on September 29, 1988, and respondent multiplied these prices by the total gallons of gasoline decedent purchased from Colonial. The charts below compare the gross sales, gross income, and net income of the Station as reported by decedent and by decedent and petitioner on their Federal income tax returns for each of the years 1984 through *337 1988, with the gross sales, gross income, and net income from the Station as determined by respondent. Gross Sales of Gasoline
As Reported by Decedent As Determined
Year
and Petitioner
by Respondent
1984
$ --        $ 970,518  1985
384,502
925,994
1986
351,180
599,856
1987
798,462
723,825
1988
688,514
638,156
Total  $ 2,222,658
$ 3,858,349
Gross Income From Gasoline Sales
As Reported by Decedent As Determined
Year
and Petitioner
by Respondent
1984
$ --     $ 106,619
1985
18,013
103,162
1986
18,084
94,431
1987
55,541
104,444
1988
75,251
117,292
Total  $ 166,889
$ 525,948
Net Income From the Station
As Reported by Decedent As Determined
Year
and Petitioner
by Respondent
1984
$ --     $ 33,623 1985
1,260 44,290
1986
3,530 17,273
1987
(5,610)
68,356
1988
13,877 58,441
Total  $ 13,057 $ 221,983
The charts below reflect for 1984 through 1988 decedent's and decedent and petitioner's reported taxable income and Federal income tax liability as reported by decedent and by decedent and petitioner and as determined by respondent. Taxable Income
As Reported
by Decedent
As Determined
Year
and Petitioner by Respondent
Difference
1984
$ --     $ 32,837 $ 32,837
1985
21,907
64,770
42,863
1986
95,554
110,161
14,607
1987
75,832
147,754
71,922
1988
161,780
220,221
58,441
*338 Income Tax Liability
As Reported
by Decedent
As Determined
Year
and Petitioner by Respondent
Difference
1984
$ --    $ 11,686
$ 11,686
1985
1,001
21,435
20,434
1986
31,114
38,100
6,986
1987
17,480
46,311
28,831
1988
47,732
68,613
20,881
During respondent's audit, decedent misrepresented to respondent's agent the year in which decedent began operating the Station. Also, decedent misrepresented to respondent's agent the amount of cash he had on hand during 1984, 1985, and 1986. Decedent initially told respondent's agent that during 1984, 1985, and 1986 he generally had on hand between $ 2,000 and $ 3,000 in cash. In a later interview, decedent told respondent's agent that during these same years he generally had on hand $ 24,000 in cash. In yet another interview, decedent told respondent's agent he had on hand $ 500,000 in cash stored in a box underneath his bed. For each of the years 1984 through 1988, respondent determined that decedent was liable for additions to tax for fraud with respect to underreporting the income from the Station and that for 1984 decedent and for 1985 through 1988 decedent and petitioner were liable for additions to *339 tax for substantial underpayment of their Federal income taxes. For 1985 and 1986, respondent disallowed decedent and petitioner's use of income averaging to compute their income taxes. For 1987, respondent determined that decedent and petitioner were liable for an addition to tax for negligence with regard to their failure to report on their 1987 joint Federal income tax return receipt of the $ 3,566 relating to the antitrust lawsuit. In 1992, respondent also audited decedent for 1986, 1987, and 1988 with respect to decedent's Federal excise tax liability on diesel gasoline sold by the Station. In April of 1992, respondent determined against decedent for 1986, 1987, and 1988 Federal excise tax deficiencies in the respective amounts of $ 44,664, $ 63,389, and $ 12,837, and certain penalties relating to diesel gasoline sold by the Station. As of the date of trial, petitioners admitted decedent's liability for these Federal diesel gasoline excise tax deficiencies, but petitioners apparently, in different proceedings, still dispute the penalties relating to these Federal excise tax deficiencies. OPINION Cash or Accrual Method of Accounting for the Station
Petitioners contend *340 that income and expenses with respect to the Station should be computed under the accrual method of accounting rather than the cash method of accounting and that petitioners should now be allowed to accrue as expenses in 1986, 1987, and 1988 the Federal excise tax deficiencies determined by respondent for each of those years in the respective amounts of $ 44,664, $ 63,389, and $ 12,837. Petitioners also contend that they should be allowed to accrue in each year unspecified state sales tax liabilities. Generally, for Federal income tax purposes, taxpayers must compute income under the method of accounting regularly used to compute income in keeping their books and records. Sec. 446(a); Epic Metals Corp. v. Commissioner, T.C. Memo. 1984-322, affd. without published opinion 770 F.2d 1069 (3d Cir. 1985). Taxpayers may report income earned from a trade or business on the cash method of accounting, the accrual method of accounting, or a hybrid method. Sec. 446(c); sec. 1.446-1(c)(1)(iv), Income Tax Regs. Generally, once taxpayers adopt a method of accounting to report income earned from a trade or business for Federal income tax *341 purposes, they cannot subsequently change the method of accounting without first obtaining respondent's consent. Sec. 446(e). Under section 471, where the production, purchase, or sale of merchandise is an income-producing factor in a trade or business, taxpayers generally are required to maintain inventories at the beginning and end of each year and to use the accrual method of accounting at least with regard to purchases and sales of the trade or business. Epic Metals Corp. v. Commissioner, supra; Chapman v. Commissioner, T.C. Memo. 1982-307; secs. 1.446-1(c)(2)(i), 1.471-1, Income Tax Regs. Where, however, taxpayers do not maintain adequate books and records to enable them to file correct tax returns, respondent has authority to recompute taxpayers' income in any manner which, in respondent's opinion, clearly reflects the taxpayers' income. Petzoldt v. Commissioner, 92 T.C. 661, 686-687 (1989); sec. 1.446-1(b)(1), Income Tax Regs.
Where taxpayers have not maintained books or records with respect to their trade or business, the taxpayers are presumed to have used the cash method of *342 accounting. Kotmair v. Commissioner, 86 T.C. 1253, 1258 (1986); England v. Commissioner, 34 T.C. 617, 620 (1960); Southeastern Mail Transport, Inc. v. Commissioner, T.C. Memo. 1992-252; Williams v. Commissioner, T.C. Memo. 1966-143. Courts have recognized that without regularly maintained books and records, it is unlikely that taxpayers could have utilized the accrual method of accounting. As stated in Brander v. Commissioner, 3 B.T.A. 231, 235 (1925) -- an accrual method without accounting records is an anomaly. Such a method is inherently an accounting system whereby one is enabled not merely to record receipts and payments after they take place but to keep track of his financial rights and obligations under a credit system. Even a simple practice of accruals would require systematic accounting and some sort of bookkeeping. Without records it may generally be concluded that the cash method is being used. * * *
Petitioners argue that inventory (namely, gasoline and other merchandise sold at the Station) was an income-producing *343 factor of decedent's Station, that the accrual method of accounting was used to compute income and expenses from the Station, and that respondent therefore erred in using the cash method of accounting in computing decedent's income and expenses of the Station. Respondent argues that income and expenses of the Station were computed on the cash method of accounting. The fact that merchandise was sold as an income-producing factor in operation of decedent's Station does not require us to conclude that the accrual method of accounting was used to compute income and expenses of the Station. Inadequate books and records were maintained by decedent that pertained to the purchase of gasoline, the sale of gasoline, and to other income and expenses associated with operation of the Station. The handwritten notes decedent gave to Anchors to prepare the tax returns do not constitute books and records. Decedent did not maintain adequate records, and it appears decedent did not maintain any records for inventory, accounts receivable, accounts payable, or reserves for bad debt that would have indicated that the accrual method of accounting was used. On the Schedules C attached to decedent and *344 petitioner's 1985 and 1988 Federal income tax returns, it was indicated that the method of accounting used to compute income and expenses of the Station was the cash method. Based on the foregoing, we conclude that the cash method of accounting was used to compute income and expenses of the Station, and we sustain respondent's determination to recompute decedent's income and expenses relating to the Station under the cash method of accounting. Petitioners' attempt to accrue in 1986, 1987, and 1988 the Federal excise tax deficiencies determined by respondent in 1988 is rejected. 12-Cent Markup
Citing Frank v. Commissioner, T.C. Memo. 1982-214, petitioners argue that the 12-cent markup used by respondent to compute gross sales of gasoline from the Station for 1984 through 1987 was excessive. Petitioners do not contest respondent's method of computing gross sales of gasoline in 1988 using prices that were indicated on the Station's gasoline pumps in September of 1988. From 1970 to 1975, the taxpayer in Frank v. Commissioner, supra, owned and operated a gas station in New York City. The taxpayer's books and records *345 were inadequate, and we held that respondent was entitled to compute the taxpayer's income using a 5-cent markup because that was the figure the taxpayer initially represented was his markup and because the 5-cent markup was consistent with gasoline sales prices of the taxpayer's competitors. Respondent's decision to use a 5-cent markup in Frank was based on the facts and circumstances of that particular case and that case is factually distinguishable from this case. Petitioners also argue that a report issued by Robert Morris & Associates (Robert Morris Report) establishes that a 12-cent markup would be excessive. Although the Robert Morris Report indicates that between 1985 and 1987 the net income of the gas stations included in the report typically represented approximately 2 percent of gross sales, the report also indicates that the gross income of gas stations included in the report was between 17.7 and 21 percent of gross sales. By using a 12-cent markup, respondent's determination in this case resulted in gross income from gasoline sales of between 11 and 17 percent of gross sales. The fact that the typical percentage of net income to gross sales reflected in the Robert *346 Morris Report is less than the percentage of net income to gross sales that results from respondent's determination does not demonstrate that use by respondent in this case of a 12-cent markup is excessive. Respondent used the 12-cent markup to determine gross sales of the Station and not the Station's net income, and in that regard the 12-cent markup is consistent with the Robert Morris Report. Respondent reasonably used a 12-cent markup based on markups used by decedent's competitors and on reports published by the Department of Energy and the Oil and Gas Journal. Both of the reports published by the Department of Energy and the Oil and Gas Journal listed monthly and annual average retail prices of gasoline sold throughout the United States. The prices reflected in the Department of Energy report and in the Oil and Gas Journal and those obtained from decedent's competitors indicate that a markup even higher than the 12-cent markup might have been reasonable. We conclude that respondent's use, in this case, of a 12-cent markup to determine gross sales from gasoline was not excessive and was not erroneous. Additions to Tax and Income Averaging
For 1984 and 1985, the addition *347 to tax for fraud constitutes 50 percent of the amount of the underpayment if any portion of the underpayment is attributable to fraud, and the addition to tax for fraud includes an increase in the interest rate equal to 50 percent of the interest payable under section 6601 with respect to the portion of the underpayment that is attributable to fraud. Sec. 6653(b)(1) and (2). For 1986 and 1987, the addition to tax for fraud constitutes 75 percent of the portion of the underpayment that is attributable to fraud, plus increased interest on that portion. Sec. 6653(b)(1)(A) and (B). For 1988, the same addition to tax for fraud applies as was applied under section 6653(b)(1)(A) for 1986 and 1987. Sec. 6653(b)(1). For 1986 and 1987, the increase in the interest rate under section 6601 is applicable if fraud is established, but for 1988, it is eliminated. For 1986, 1987, and 1988, if any portion of the underpayment is attributable to fraud, the entire underpayment is treated as attributable to fraud unless the taxpayer demonstrates otherwise. Sec. 6653(b)(2). Respondent has the burden to prove by clear and convincing evidence that a taxpayer is liable for additions to tax for fraud. Sec. *348 7454(a); Rule 142(b). Respondent must establish for each year an underpayment of taxes owed and a fraudulent or intentional wrongdoing for the purpose of avoiding payment of taxes known to be owed. King's Court Mobile Home Park, Inc. v. Commissioner, 98 T.C. 511, 515 (1992); DiLeo v. Commissioner, 96 T.C. 858, 874 (1991), affd. 959 F.2d 16 (2d Cir. 1992). Although fraud is not presumed, fraud may be inferred from conduct the effect of which would be to mislead, conceal, or otherwise prevent the collection of taxes. Spies v. United States, 317 U.S. 492, 499 (1943); Korecky v. Commissioner, 781 F.2d 1566, 1568 (11th Cir. 1986), affg. T.C. Memo. 1985-63. Failure to keep records of income and expenses may be evidence of fraud. Korecky v. Commissioner, supra at 1568; Grosshandler v. Commissioner, 75 T.C. 1, 20 (1980); Otsuki v. Commissioner, 53 T.C. 96, 109 (1969). Failure to cooperate with respondent during the course *349 of an audit may be evidence of fraud. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601. Failure to keep books and records coupled with underreporting of income over a number of years may be evidence of fraud. Gopal v. Commissioner, T.C. Memo. 1988-394, affd. without published opinion 899 F.2d 1224 (9th Cir. 1990). Petitioners argue that decedent was unsophisticated and completely reliant on Anchors to prepare decedent's and decedent and petitioner's Federal income tax returns and that any errors in their Federal income tax returns were the fault not of decedent, but of Anchors. The evidence in this case establishes that decedent was a successful businessman who, during the years in issue, deliberately underreported income earned from the Station. Decedent did not maintain adequate books and records with respect to the Station. Decedent did not provide Anchors with accurate figures with respect to the cost of gasoline and the gross sales of gasoline from the Station. Decedent did not disclose accurate information to Anchors, and *350 petitioners are not allowed to now shift to Anchors responsibility for decedent's failure to accurately report sales of gasoline from the Station. Alexander Shokai, Inc. v. Commissioner, 34 F.3d 1480, 1486 (9th Cir. 1994), affg. T.C. Memo. 1992-41; United States v. Claiborne, 765 F.2d 784, 798 (9th Cir. 1985). The record contains numerous facts indicating that decedent intentionally underreported income earned from the Station. Decedent did not disclose to Anchors his ownership of the Station until nearly 2 years after decedent acquired the Station. Decedent began to report income from the Station only after respondent, as a result of the first Federal excise tax audit, became aware that decedent owned the Station. Decedent consistently underreported income from the Station. Even after decedent, in 1986, was audited and assessed deficiencies for unpaid Federal excise taxes for 1983, 1984, and 1985 on diesel gasoline sales, decedent continued in subsequent years to underreport Federal excise taxes due on sales of gasoline from the Station. We have already sustained respondent's adjustments to *351 decedent's and decedent and petitioner's income and expenses, and we have sustained respondent's determinations of decedent's and decedent and petitioner's Federal income tax deficiencies for each year. We also conclude that decedent fraudulently underreported Federal income taxes that he knew to be owing, and we conclude that for each of the years in issue the fraud is attributable to the entire amount of unreported income from the Station. With respect to the addition to tax for negligence under section 6653(a)(1), determined by respondent for 1987 for failure to include in taxable income $ 3,566 received from a lawsuit, and with respect to the addition to tax for each of the years in issue for substantial understatement of income taxes under section 6661, petitioners have the burden of proof to establish that respondent's determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Petitioners, however, did not present any evidence or make any separate argument with respect to either of these additions to tax. We sustain respondent's determinations of the addition to tax for negligence and the addition to tax for substantial *352 understatement of income taxes. With respect to income averaging, the taxpayer has the burden of proof to establish the amount of income earned in the 4 taxable base years immediately preceding the year in which income averaging is sought. Rule 142(a); Welch v. Helvering, supra; Larson v. Commissioner, T.C. Memo. 1994-302. Petitioners did not present any evidence or make any arguments with respect to decedent and petitioner's entitlement to income averaging. We sustain respondent's disallowance of income averaging for 1985 and 1986. Decisions will be entered for respondent. Footnotes
1. Cases of the following petitioners are consolidated herewith: Estate of Jack W. Shuman, Deceased, Nancy R. Shuman, Administratrix C.T.A. and Nancy Shuman, docket Nos. 2776-91, 2777-91, and 13019-91.↩
*. The tax deficiency for 1984 and the sec. 6653(b)↩ additions to tax for 1984 through 1988 are asserted only against decedent's Estate.
**. 50 percent of the interest due on portion of the underpayment attributable to fraud.↩
2. This constitutes a new issue raised by petitioners at trial. In our discretion, we allow petitioners to raise this issue. See Rule 41(a).↩